542 P.2d 427

**The STATE of Arizona, Appellee,**

v.

**Guadalupe TURRUBIATES, Appellant.**

**No. 2 CA–CR 633.**

Court of Appeals of Arizona, Division 2.

Nov. 13, 1975.

Rehearing Denied Dec. 18, 1975.

Review Denied Jan. 27, 1976.

**236**

Bruce E. Babbitt, Atty. Gen., Phoenix, by William J. Schafer, III, and Shirley H. Frondorf, Asst. Attys. Gen., Tucson, for appellee.

Aboud & Aboud by John Aboud, Tucson, for appellant.

## OPINION

HOWARD, Chief Judge.

This case involves the death of a seven week old child as a result of a skull fracture and subdural hematoma. An autopsy revealed the presence of arm and rib fractures. Appellant, the child's natural father, was charged with the infant's murder. The jury was instructed on all degrees of homicide and returned a verdict of guilt on the lesser included offense of involuntary manslaughter. From the judgment of guilt and the imposition of a five to ten year prison sentence, this appeal is taken.

Appellant claims seven sources of error —two question the sufficiency of the evidence, two question the propriety of the conduct of the prosecutor, two question the admissibility of certain evidence, and one questions the manner in which the police investigation was carried out. Finally, appellant contends that if affirmance is in order, the sentence is excessive. We find no error and affirm.

The facts taken in the light most favorable to upholding the verdict are that Isidora Turrubiates was born on July 28, 1974, at St. Joseph's Hospital in Tucson. Mrs. Turrubiates began labor on the way to the hospital and the child was partially protruding when the mother was taken from the car by wheelchair to the labor room. The child was delivered before the attending physician arrived.

Because of the child's slightly premature birth and small size, she was placed in an incubator at St. Joseph's and then transferred to the intensive care nursery at Tucson Medical Center (TMC). She was examined by the obstetrician immediately after birth and no abnormalities were noted. She was further examined on a daily basis by a pediatrician at TMC from the date of her admission until her discharge on August 8th. As part of her discharge examination, chest x-rays were taken which showed no rib fractures. The prognosis for the child on the date of her release was good.

The care and control of the child was exclusively in Mr. and Mrs. Turrubiates except for a short period on September 11th when Mrs. Palanco (the wife's mother) took care of her while the Turrubiates attended a funeral. It was on this date that Mrs. Palanco noticed that the child did not appear well. She described her as feverish and vomiting. She advised the Turrubiates to take the child to a doctor.

The following day, the parents took the child to the clinic at Davis Monthan Air Force Base. Mrs. Turrubiates described the child as sleepy and her vomiting as continuous. A doctor examined her on the 12th and released her to her parents. The vomiting continued so the parents returned with her to the clinic on the 13th. On this occasion, the child was x-rayed and again released with the advice that perhaps a change of formula would ease the vomiting.

The child was able to hold down the new formula so the parents accepted the old formula as the cause of the illness from the 11th through the 13th. On the 14th, they went to a wedding and took the child with them. Sometime between 10:30 and 11:00 p. m. they noticed that the child was crying and restless so they took her home. The parents noticed nothing further of an unusual nature until the evening of the 17th when she started vomiting again. Mrs. Turrubiates left the room for something to clean the baby with and when she returned she saw her husband attempting to revive the unconscious child by mouth to mouth resuscitation.

The parents rushed the child to Davis Monthan and she was then transferred to the intensive care pediatric unit at TMC. X-rays taken at TMC on September 18th and 19th revealed a skull fracture, a subdural hematoma, a fracture of the right radius, and fractures of rib numbers 4, 5, 6, 7 and 8 on her left side, and near the spine, fractures of rib numbers 5, 6, 7, 8 and 10, indicating that rib numbers 5, 6, 7 and 8 were fractured in two locations. Treatment consisted of several subdural taps to relieve pressure on the brain, a respirator to perform the breathing function, heat lamps and cooling blankets to maintain a constant body temperature, intravenous feedings and catheterization. In addition she was given antibiotics and other medications. In spite of the treatment given, Isidora died at 1:35 p. m. on September 26th, 1974, never having regained consciousness.

The cause of death was described as "a subdural hematoma which caused pressure on the brain and caused destruction of the brain tissue resulting in respiratory arrest and ultimately cardiac arrest." A pathologist testified that the subdural hematoma on the right side of the brain was caused by the skull fracture on the left side of the head. This was referred to as a "contra-coup injury" or a bruising of the brain on the side opposite the area where force is applied to the skull. Because of the tender age of the child, the pathologist testified that substantial or severe force had to have been applied in order to cause the type of fracture which occurred here. He also expressed his opinion that due to the shape of the fracture, it would have been caused by the skull striking hard, flat object. Finally, in response to a hypothetical question by the prosecutor, he testified that the type of injuries to the child's anatomy fell within the category of the "battered child syndrome."

Two definitions of the "battered child syndrome" were offered, one of which was from a pathologist's point of view, referring to the traumatic injuries to the body, and the other from a pediatrician's point of view, referring to injuries of a non-accidental nature. The pediatrics expert could not say that these particular injuries were not caused by accident, but rather deferred to police investigators to determine that issue. The pathologist's testimony, however, referred to the source of the injury as a "mechanical force" applied to the body as opposed to the body falling or bumping an object with only the force of its own weight.

We note that this evidence established a reasonable inference that the child died as a result of a criminal agency. It was thus proper to introduce appellant's confession to establish that it was his criminal agency which caused the death. There was no requirement that the corpus delicti be established beyond a reasonable doubt prior to the introduction of appellant's confession which might serve the dual purpose of connecting him with the crime and proving the corpus delicti beyond a reasonable doubt. *State v. Hernandez*, 83 Ariz. 279, 320 P.2d 467 (1958); *State v. Hankey*, 98 Ariz. 104, 402 P.2d 418 (1965).

Appellant's confession indicates that approximately a week prior to September 12th or 13th, he was changing the baby, became angry, and threw her into the crib "kinda hard." He admitted that "there's a possibility that I could have hurt the baby then." He also admitted that the child might have hit her head, that she had a hard time breathing and was in pain a couple of days later, and that his wife never hit the child hard enough to make her cry.

These admissions, taken together with the expert testimony (1) placing the age of the skull fracture as at least two weeks old on September 27th, the date of the autopsy; (2) describing the force of an adult male throwing a small child against a hard flat surface as sufficient to have caused this type of injury; (3) that the subdural fluid which was tapped from the skull was at least five to six days old and possibly a couple of weeks old on September 18th, the date of the tap; and (4) that the symptoms which developed on September 11th, 12th, and 13th were indications of a skull fracture, but that it might take some time for the subdural fluid to exert sufficient pressure on the brain to produce the symptoms which appeared on the 17th; constitute a sufficient chain of circumstantial evidence pointing to the guilt of appellant for the jury not to have found reasonable doubt that it was this incident which caused the death of the child and that appellant was the criminal agent responsible. Any doubt about whether or not the child hit her head during this incident was cured by the statement of Mrs. Turrubiates to the police which was used to impeach her trial testimony. She indicated in the statement that she entered the baby's room during the last week of August or the first week of September and saw the child striking the crib with her head. Afterward appellant apologized to her for having been so rough with the child.

Appellant introduced a great deal of evidence in an attempt to convince the jury that this particular incident did not cause the death of the child. He contends that by providing alternative theories, he was entitled to a directed verdict of acquittal on the ground that he could not be convicted solely on the basis of circumstantial evidence unless that evidence was "not only consistent with guilt, but inconsistent with every reasonable hypothesis of innocence," citing *State v. Bearden*, 99 Ariz. 1, 405 P.2d 885 (1965) which cites *State v. Tigue*, 95 Ariz. 45, 386 P.2d 402 (1963) which was expressly overruled in *State v. Harvill*, 106 Ariz. 386, 476 P.2d 841 (1970). Needless to say, this is no longer the law in Arizona. The test, whether the evidence is circumstantial or direct, is whether the evidence was sufficient for

the jury to find appellant guilty beyond a reasonable doubt. As we have indicated, we find the evidence sufficient. Appellant's evidence could well have been, and apparently was, rejected by the jury.

■ Appellant also cites *Johnson v. Harris,* 23 Ariz.App. 103, 530 P.2d 1136 (1975) for the proposition that the jury must be convinced that "it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." *Johnson,* of course is a tort case and the burden on the State in a criminal case is greater than that described in the quoted portion of the opinion. If appellant's contention is that if a directed verdict must be granted a defendant in a tort case when the evidence is at best evenly balanced, then the same is true in a criminal case, he is undoubtedly correct. We do not, however, view the evidence here as evenly balanced, nor do we see any room for speculation on the part of the jury as to whether appellant or his wife was the criminal agent. By appellant's own admission, his wife never hit the baby hard enough to make her cry.

■ Appellant's contention that he was prejudiced by the prosecutor's remark in his opening statement to the jury that the evidence would establish that appellant "smashed" the child against the crib is without merit. Some latitude is allowed in the discussion by counsel of facts supplied by the evidence. See *State v. Robinson,* 99 Ariz. 241, 408 P.2d 29 (1965). The principal requirement is that the prosecutor stick to the facts to be introduced in evidence and limit his argument to reasonable inferences to be drawn from those facts. *State v. Maloney,* 105 Ariz. 348, 464 P.2d 793 (1970), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970). We find the word "smashed" to be a reasonable description of the act of throwing a child against a crib with substantial force and therefore find no prejudice to appellant.

■ Likewise, appellant's contention that he was prejudiced by the prosecutor's

insinuation that Mrs. Turrubiates told no one about the other possible explanations for the injury until the time of trial is without merit. The insinuation could as well be that she failed to disclose this information to the police at the time they questioned her, as that she made up her story on the stand. Even the latter implication is proper impeachment in a case such as this. *State v. Miniefield,* 110 Ariz. 599, 522 P.2d 25 (1974).

■ Nor do we find any merit to appellant's contention that he was prejudiced by the introduction of 8x10 black and white photographs of the deceased child. Their admissibility depended upon their probative value. *State v. Swafford,* 21 Ariz.App. 474, 520 P.2d 1151 (1974). The photographs aided the testimony of the pathologist in describing the injuries to the jury. The x-rays were introduced to show the absence of fractures at the date the child was released following her birth, and their presence when she was x-rayed at Davis Monthan and again at TMC. The photographs depicted the hematoma and skull fracture in a way which the x-rays could not. They were not, therefore, cumulative.

■ The evidence of fractured ribs and a fractured radius were clearly admissible to "support the conclusion that death did not result from accident or that the continuous assault on the child's vital forces were contributing causes of the death." *State ex rel. Berger v. Superior Court,* 108 Ariz. 396, 397, 499 P.2d 152, 153 (1972).

■ We fail to perceive appellant's point in arguing on these facts that he was denied due process under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He argues that *Brady* in connection with *United States v. Dye,* 221 F.2d 763 (3rd Cir. 1955) required the police officers to investigate every possible circumstance which might exculpate him. Neither case holds this. Both cases deal with the suppression of evidence which the

prosecutor had at his disposal. No such evidence was at the prosecutor's disposal here. All of the evidence he had pointed to appellant's guilt. No due process issue under *Brady* is therefore present here.

■ The police reported the evidence as it developed. They asked both Mr. and Mrs. Turrubiates if there were any other incidents in which the child could have been injured and received negative responses from them both. We fail to understand what it is that appellant would have had them do. We will not, by judicial fiat, require the police to expend valuable time searching for exculpating evidence when they have developed a sufficient case against an accused. If exculpating evidence comes to their attention during the investigation, *Brady* requires the prosecutor to furnish defense counsel with its substance. Beyond this, *Brady* does not go.

■ Finally appellant contends his sentence is excessive. A.R.S. Sec. 13–457 sets the punishment for involuntary manslaughter at not to exceed ten years. Appellant was sentenced to not less than five nor more than ten years at the Arizona State Prison. The probation officer recommended eight to ten years. When the sentence imposed is within the statutory limits, appellate interference is warranted only if the sentence is excessive under the circumstances. *State v. Gonzales*, 106 Ariz. 303, 475 P.2d 485 (1970). We find no such circumstances here.

The judgment and sentence are affirmed.

KRUCKER and HATHAWAY, JJ., concur.