87 P.3d 851

**STATE of Arizona, Appellee,**

v.

**Maria de Lourdes NIEVES, Appellant.**

**No. 1 CA–CR 02–0937.**

Court of Appeals of Arizona, Division 1, Department C.

April 15, 2004.

Terry Goddard, Attorney General By Randall M. Howe, Chief Counsel, Criminal Appeals Section and Michael T. O'Toole, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender By Susan L. Corey, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

SNOW, Judge.

¶ 1 Maria de Lourdes Nieves appeals her conviction for first-degree premeditated murder. She claims that the trial court committed reversible error by finding sufficient evidence, other than her own statements, to establish her guilt. For the following reasons, we reverse Nieves's conviction and resulting sentence.

## FACTS AND PROCEDURAL HISTORY

¶ 2 The charge against Nieves resulted from the death of her ten-month-old daughter, Michelle. On the night Michelle died, Nieves told Pastora Elba Talavera that Michelle died in her sleep.[1] About two weeks later, however, Nieves told Pastora Talavera a different version of events. Nieves confessed that after apologizing to Michelle, she covered the baby's nose and mouth with her hand until the baby stopped breathing. Nieves told Pastora Talavera that she killed Michelle because her husband, Nelson, had said during an argument several days before Michelle's death that he was going to leave Nieves and take the baby with him. Pastora Talavera thought overnight about what to do with this information, then told her husband, Juan, what Nieves had told her. Juan called the police.

¶ 3 In response to Juan Talavera's call, two police officers met with Nieves at the church that night. Detective Jose Cisneros testified that when he asked Nieves to come with them to the police station, she said, "I did it out of frustration. I didn't mean to do it." Nieves agreed to go to the police station, and Pastora Talavera accompanied her.

¶ 4 At the station, Nieves told Detective Cisneros that she covered Michelle's mouth and nose with one hand, which prevented the baby from breathing. She then let go, left the room, and began cleaning the apartment. When she returned to check on Michelle shortly thereafter, the baby was dead. Nieves called Blanca Beceira, her husband's adult daughter from a previous relationship, and asked her to come as quickly as she could. Nieves then called her husband. After they arrived, someone called 9–1–1. Paramedics responded to the call and Michelle was taken to a hospital where she was pronounced dead.

---

1. Elba Talavera and her husband Juan are both ordained ministers and preside over a nonde-

nominational congregation in the Phoenix area.

¶ 5 The State charged Nieves with first-degree murder. After holding a pretrial voluntariness hearing, the trial court found that Nieves's statements to Detective Cisneros were voluntary. The jury found Nieves guilty, and the trial court sentenced her to life in prison with the possibility of parole after thirty-five years. Nieves filed a timely notice of appeal, and we have jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes ("A.R.S.") sections 12–120.21(A)(1) (2003), 13–4031 (2001) and 13–4033(A) (2001).

## ANALYSIS

### The Trial Court Erred by Finding that Evidence Independent of Nieves's Statements Established the Corpus Delicti.

¶ 6 Before trial, Nieves filed a motion to dismiss challenging the admissibility of her statements to Pastora Talavera and Detective Cisneros. Nieves contended that without those statements, the State could not establish the corpus delicti. On appeal, Nieves assigns error to the trial court's ruling on her motion to dismiss. She contends that absent her admissions, there was no evidence giving rise to a reasonable inference that Michelle's death was the result of a crime. The State responds that Michelle's body and her unexplained death constituted sufficient circumstantial evidence to satisfy the corpus delicti rule. We disagree.[2]

¶ 7 "A defendant may not be convicted of a crime based upon an uncorroborated confession without independent proof of the corpus delicti, or the 'body of the crime.' " *State v. Morgan*, 204 Ariz. 166, 170, ¶ 15, 61 P.3d 460, 464 (App.2002). The corpus delicti rule requires that, before a defendant's statements are admissible as evidence of a crime, the State must show both proof of a crime and that someone is responsible for that crime. *State v. Jones*, 198 Ariz. 18, 21, ¶ 11, 6 P.3d 323, 326 (App.2000). The purpose of the rule is "to prevent a conviction based solely on an individual's uncorroborated confession, the concern being that

such a confession could be false and the conviction thereby lack fundamental fairness." *State v. Flores*, 202 Ariz. 221, 222, ¶ 5, 42 P.3d 1186, 1187 (App.2002) (citation omitted); *State ex rel. McDougall v. Superior Court*, 188 Ariz. 147, 149, 933 P.2d 1215, 1217 (App.1996) ("The rationale for the [corpus delicti] doctrine was the realization that a defendant's confession might be untrustworthy due to mental instability or improper police procedures."). "Additionally, ... [w]hile other legal principles and rules of evidence protect the defendant from involuntary confessions, proof may be difficult to obtain, making this protection inadequate in certain cases." *Jones*, 198 Ariz. at 21, ¶ 11, 6 P.3d at 326.

¶ 8 To establish the corpus delicti in a homicide case, the State must introduce, in its case-in-chief, evidence independent of the defendant's inculpatory statements that raises a reasonable inference that the death in question was caused by criminal conduct. *State v. Hall*, 204 Ariz. 442, 453, ¶ 43, 65 P.3d 90, 101 (2003) (discussing the corpus delicti rule and holding that the State had established the corpus delicti in a first-degree murder case). If the State introduces such independent evidence, it may then also introduce the defendant's inculpatory statements. *Id.* The State's independent proof can be circumstantial. *Id.; see also Flores*, 202 Ariz. at 222, ¶ 5, 42 P.3d at 1187 (noting that the "State's proof need establish only a reasonable inference that the crime charged was actually committed").

¶ 9 The court addressed Nieves's motion to dismiss for failure to establish the corpus delicti off the record. Later, the trial court briefly referred to the off-the-record discussion and stated the court had "overruled" the motion "based upon oral argument." The court thus found that Nieves's statements were admissible because the State would be able to present evidence, in its case-in-chief, independent of Nieves's confession that Michelle's death was the result of criminal conduct.

---

**2.** Based on our disposition of this issue, we decline to address the other issues Nieves raises on appeal.

¶ 10 The State accordingly introduced Nieves's admissions to Pastora Talavera and Detective Cisneros. At the close of the State's case, Nieves moved for a judgment of acquittal under Arizona Rule of Criminal Procedure 20(a).[3] The motion was based in part on Nieves's contention that the State failed to satisfy the requirements of the corpus delicti rule during its case-in-chief and thus should not have been permitted to introduce Nieves's confessions. The trial court denied the motion.

¶ 11 In Nieves's case, the evidence regarding the cause of Michelle's death, independent of Nieves's statements, is as follows. Blanca Beceira testified that several days before Michelle's death, she saw the baby repeatedly losing consciousness for short periods of time, but the baby then "snapped out of it." A day or two later, Beceira said, she saw Michelle having problems breathing.

¶ 12 Pediatrician Kazue Yamada testified that he examined Michelle the day before her death. Nieves reported to him at the examination that Michelle had a temperature of 101 degrees for two days and diarrhea for five days. She also reported the baby was eating well. Dr. Yamada said the baby did not have a fever during the visit. Michelle was well-hydrated and had a normal heart rate. He diagnosed diarrhea caused by a common intestinal virus. Dr. Yamada said he was not told Michelle had recently lost consciousness, which would have been a "fairly significant" development warranting further examination.

¶ 13 Dr. John Hu, a medical examiner, testified that he conducted an autopsy one day after Michelle died. His examination revealed no abnormalities. He found no evidence of trauma, nasal blocking, infections, or problems with Michelle's lungs, heart, organs, or brain. Dr. Hu said there was no organic reason for Michelle's death and that the cause of death was undetermined. He reported to police that there was no evidence of suffocation and that Michelle's was "probably a SIDS death."[4]

¶ 14 Two weeks after Dr. Hu conducted the autopsy, Detective John Cleary met with Pastora Talavera and was told about Nieves's admission that she had suffocated Michelle. It was later that day when Nieves made her statements to Detective Cisneros, and Detective Cleary then conveyed this information to Dr. Hu. Only after hearing about Nieves's admissions did Dr. Hu conclude that "asphyxia due to smothering" could not be ruled out as a cause of death.[5] Even then, Dr. Hu acknowledged it was only possible, not probable, that smothering caused Michelle's death.[6]

¶ 15 Dr. Hu candidly admitted that he changed his conclusion from SIDS as the probable cause of death to being unable to rule out suffocation after he learned about the confessions. Our supreme court has held that if evidence aside from a defendant's confession does not establish the corpus delicti, a defendant's confession in a police report cannot be used. *State v. Janise*, 116 Ariz. 557, 559, 570 P.2d 499, 501 (1977) (citation omitted).

3. Rule 20(a) requires acquittal "if there is no substantial evidence to warrant a conviction."

4. Dr. Hu testified that "SIDS" refers to Sudden Infant Death Syndrome. According to Dr. Hu, it is a sudden death that remains unexplained after a complete autopsy. SIDS occurs in children under the age of one year, and is most common in children between the ages of two months and six months. In reaching his conclusion about Michelle's death, Dr. Hu further testified that when making his initial findings, he relied on evidence that Nieves's husband had an infant in a previous relationship that died of SIDS.

5. Dr. Hu further testified that apart from SIDS, two other natural causes of death could not be ruled out, although he said that it was "highly, extremely unlikely, if not impossible," that they caused Michelle's death. Dr. Hu described these other two causes of death as metabolic acidosis, a condition caused by "underlying metabolic disease" and marked by severe dehydration, and hypokalemia, a condition marked by insufficient blood levels of potassium or electrolytes.

6. With respect to ruling out a diagnosis of possible positional asphyxia, or self-suffocation, Dr. Hu's testimony was less definite. He initially testified that there was no indication self-suffocation occurred and that it was quite unlikely in a baby of Michelle's age. He later stated that he could not rule out the possibility of self-suffocation, but then testified that after reviewing materials from the scene investigation, he was able to rule out self-suffocation to a reasonable degree of medical certainty.

¶ 16 We have been unable to find any Arizona cases with facts similar to those presented here. Cases from Washington and California are, however, remarkably similar to Nieves's case. The Washington case, *State v. Pineda*, 99 Wash.App. 65, 992 P.2d 525, 527 (2000), involved the death of a nine-day-old child who was found dead in bed with the sleeping defendant. The child died less than twenty-four hours after a doctor had examined the infant and had found her healthy. *Id.* About thirty-six hours after the child's death, police interviewed the defendant. *Id.* At the end of the interview, the defendant said it was possible that she had suffocated the baby, although she could not remember. *Id.* at 529.

¶ 17 On the same day as the defendant's interview, a forensic pathologist performed an autopsy of the child. *Id.* He found no external or internal evidence to explain the cause of death, but did note internal hemorrhages that were commonly found in SIDS cases. *Id.* After the autopsy, the pathologist spoke with the police and learned about the defendant's statement. *Id.* Based on the statement, the pathologist concluded that the cause of death "was asphyxiation as a result of suffocation or smothering." *Id.* He acknowledged that but for the defendant's statement, his diagnosis would have been probable SIDS. *Id.* at 530.

¶ 18 The defendant was charged with manslaughter and moved to dismiss for lack of corpus delicti. *Id.* At a pretrial hearing, a defense expert testified that after reviewing the pertinent records, he thought that SIDS, not suffocation, was the likely cause of death. *Id.* An expert for the State opined that based on the evidence, he would have been hesitant to label the cause of death as either SIDS or suffocation, and would simply have concluded the cause was undetermined. *Id.* at 531.

¶ 19 The trial court granted the defendant's motion to dismiss and the State appealed. *Id.* The appellate court applied the same test we use in Arizona, determining whether the State presented evidence, independent of a defendant's statement, that supported a reasonable inference that the death resulted from criminal conduct. *Id.* at 532. The court held that "[a]n expert opinion based wholly on the defendant's statements is not 'independent of' those statements. Because [the pathologist's] opinion was based wholly on [the defendant's] statements, it cannot be used to satisfy the corpus delicti rule, and the trial court acted properly by not considering it." *Id.* at 533.

¶ 20 The appellate court also found that the following evidence did not, without more, support a reasonable inference that the baby died as a result of a criminal act: that the baby was only nine days old when she died; that she "seemed healthy just before her death"; that the pathologist "found nothing in his autopsy"; that the defendant "was present and fully dressed" when the baby died; and that the defendant showed no emotion after the child's death. *Id.* at 533–34. The court concluded that the State failed to establish the corpus delicti and that the trial court properly dismissed the case. *Id.* at 534.

¶ 21 In the California case, *Iiams v. Superior Court*, 236 Cal.App.2d 80, 45 Cal.Rptr. 627, 629 (1965), the defendant was charged with child beating after bringing a badly injured five-week-old child to a hospital for treatment. At issue was whether the State established the corpus delicti through the hospital doctor, who was the only witness at the preliminary hearing. *Id.* at 629. But for the defendant's admissions to the doctor that he was the child's father and had played roughly with the child, the doctor could not determine whether the child's injuries were caused by criminal or non-criminal conduct. *Id.* at 630. The court concluded that absent the defendant's statements, the evidence failed to establish "some rational ground for assuming the possibility that the offenses charged ... had occurred." *Id.* at 630–31.

¶ 22 Dr. Hu's testimony in this case that suffocation could not be ruled out virtually paralleled that of the doctors in *Pineda* and *Iiams*. Dr. Hu originally attributed the cause of Michelle's death to SIDS, and only revised his opinion as to the cause of death after he learned of Nieves's confession. Furthermore, as in *Pineda*, the evidence, independent of the defendant's statements, established only that an infant who was found to

be healthy only a day earlier had inexplicably died in her sleep.

¶ 23 The State argues that an inexplicable death alone is sufficient to give rise to an inference that the death was the result of criminal conduct. It asserts that two cases, *State v. Thompson,* 146 Ariz. 552, 557, 707 P.2d 956, 961 (App.1985), and *State v. Turrubiates,* 25 Ariz.App. 234, 238, 542 P.2d 427, 431 (1975), support this proposition. We disagree.

¶ 24 In *Thompson,* one of the child victims displayed numerous bruises and welts and told officers that the defendant had inflicted the injuries with a belt. 146 Ariz. at 554, 707 P.2d at 958. The defendant admitted hitting the child with the belt after losing his temper, but claimed to have "caught himself" and stopped. *Id.* at 555, 707 P.2d at 959. On appeal, we found that the victim's statements to police officers were inadmissible hearsay, but found the error harmless because the defendant's own statements were not barred by the corpus delicti rule as the "multiple bruises on [the victim's] back and thigh in a pattern consistent with the belt's impact are sufficient to establish the corroboration needed to consider [the defendant's] own statement." *Id.* at 557, 707 P.2d at 961. This evidence was established before the defendant's inculpatory statements were admitted. *Id.*

¶ 25 Likewise in *Turrubiates,* the child victim died from a subdural hematoma that was the result of a skull fracture. 25 Ariz.App. at 237, 542 P.2d at 430. An autopsy also revealed arm and rib fractures. *Id.* The State presented expert testimony that substantial or severe force had to have been applied to the body in order to cause the skull fracture and that the force could not have resulted from the body falling or bumping an object. *Id.* at 237–38, 542 P.2d at 430–31. This testimony was introduced before any of the defendant's statements. *Id.*

¶ 26 In both these cases, the State presented more than adequate evidence of criminal causation prior to admitting the statements of the defendants. In fact, criminal causation was evident from the nature and severity of the injuries. That is simply not the case here, where there is no evidence inde-

pendent of Nieves's confession that gives rise to an inference that the death was the result of criminal conduct. Thus, we find the reasoning of *Pineda* and *Iiams* persuasive. We find no facts in the instant case sufficient to justify a contrary conclusion.

¶ 27 A recent Arizona case, *State v. Morgan,* 204 Ariz. at 170–73, ¶¶ 14–24, 61 P.3d at 464–67, includes a detailed discussion of the corpus delicti rule, outlines some of the alternatives used in other jurisdictions, and eventually concludes that in Arizona, a corroborated confession may be used to establish proof of a crime. While *Morgan* was factually very different from this case, in that it discusses the applicability of the corpus delicti rule in a prosecution for several sexual assault and abuse crimes, the holding in *Morgan* is consistent with our result here. In that case, the defendant was charged with multiple, closely-related crimes after confessing to police officers. *Id.* at 169, ¶ 6, 61 P.3d at 463. While independent evidence corroborated the defendant's confession to several of the crimes, the defendant argued on appeal that the corpus delicti rule was violated because two of the charged crimes lacked such corroboration. *Id.* at 170, ¶ 14, 61 P.3d at 464. The court found that even absent corroborating evidence of these two crimes, the defendant's confession itself was sufficiently corroborated by the direct and circumstantial evidence supporting the other crimes charged to satisfy the corpus delicti rule. *Id.* at 173, ¶ 24, 61 P.3d at 467 (holding that "the confession was sufficiently corroborated to eliminate any concern that it could be untrue, and, thus, supported a 'reasonable inference' that the offense had occurred").

¶ 28 The *Morgan* court stressed that a confession could be corroborated when "independent evidence ... bolster[s] the confession itself and thereby prove[s] the offense 'through' the statements of the accused." *Id.* at 171, ¶ 18, 61 P.3d at 465 (quoting *Smith v. United States,* 348 U.S. 147, 156, 75 S.Ct. 194, 99 L.Ed. 192 (1954)). The court also relied on *State v. Gillies,* 135 Ariz. 500, 506, 662 P.2d 1007, 1013 (1983), a sexual assault case in which the court held that circumstantial evidence, including that the victim's underpants had been removed and that her

shoe was found inside her pantyhose, was sufficient to establish the corpus delicti even absent any specific evidence of sexual assault. *Id.* at 172, ¶ 22, 61 P.3d at 466. These cases are distinguishable from this case because none of the direct or circumstantial corroborating evidence used to bolster the defendant's confession and establish the corpus delicti in these cases is present here. Had Nieves not confessed to the murder, no other evidence whatsoever exists to indicate that a crime was committed.

¶ 29 Further, to hold that an inexplicable death alone is sufficient to give rise to an inference that the death was the result of criminal conduct would render the corpus delicti rule without any practical effect in homicide cases. While the continued viability of the corpus delicti rule has been questioned of late,[7] the rule has recently been applied by our supreme court in a homicide case. *See Hall,* 204 Ariz. at 453–54, ¶¶ 43–47, 65 P.3d at 101–02 (holding that although the victim's body was never recovered, sufficient circumstantial evidence was admitted to establish the corpus delicti in a first-degree murder case). We do not have the authority to modify or disregard rulings of the Arizona Supreme Court. *State v. Smyers,* 207 Ariz.

314, ¶ 15 n. 4, 86 P.3d 370 (2004). Finally, the State does not argue that the rule should be reconsidered or that it is inapplicable to this case. Thus, we are compelled to conclude that the trial court erred by admitting Nieves's statements and by denying Nieves's motion for judgment of acquittal. We accordingly reverse Nieves's conviction and sentence for first-degree murder.

## CONCLUSION

¶ 30 For the aforesaid reasons, we reverse Nieves's conviction and sentence, remanding the case for dismissal consistent with *Gillies,* 135 Ariz. at 506, 662 P.2d at 1013, and *Jones,* 198 Ariz. at 23, ¶ 14, 6 P.3d at 328.

CONCURRING: WILLIAM F. GARBARINO, Judge and JOHN C. GEMMILL, Judge.

**7.** *See, e.g.,* David A. Moran, *In Defense of the Corpus Delicti Rule,* 64 Ohio St. L.J. 817, 831–35 (2003) (arguing for retention of the corpus delicti rule but finding that both the federal government and a number of states have replaced the corpus delicti rule with a "trustworthiness" standard); R. Hawthorne Barrett, *Corpus Delicti in DUI Cases,* 49 S.C. L.Rev. 1115, 1128 (1998) (discussing use of the corpus delicti rule in South Carolina and noting that other states have modified or abandoned the corpus delicti rule entirely); Thomas A. Mullen, *Rule Without Reason: Requir-* *ing Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession,* 27 U.S.F.L.Rev. 385, 385–86 (1993) (arguing that the corpus delicti rule does not serve its intended purposes); *see also* Catherine L. Goldenberg, Comment, *Sudden Infant Death Syndrome as a Mask for Murder: Investigating and Prosecuting Infanticide,* 28 Sw. U.L.Rev. 599, 612–22 (1999) (discussing "the difficulty courts have in applying the corpus delicti rule in cases where an unexplained infant death had originally been diagnosed as SIDS").