NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

ROBERT JOHN INTERVAL, *Appellant*.

No. 1 CA-CR 19-0325
FILED 11-5-2020

Appeal from the Superior Court in Maricopa County
No. CR2017-126548-001
The Honorable Stephen M. Hopkins, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

The Ferragut Law Firm, PC, Phoenix
By Ulises A. Ferragut, Jr.
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Maurice Portley[1] delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Lawrence F. Winthrop joined.

**P O R T L E Y**, Judge:

**¶1**      Robert John Interval appeals his second-degree murder conviction and sentence. He argues the superior court erred by: (1) denying his motion for judgment of acquittal because there was insufficient evidence to support his conviction under the *corpus delicti* rule; and (2) erroneously admitting other act evidence under Arizona Rule of Evidence 404(b). Because we find no reversible error, we affirm.

### FACTS AND PROCEDURAL HISTORY[2]

**¶2**      C.M., the victim, was looking for a roommate in 2012 and met Interval online. He moved in with her and her daughter, D.A. The adults soon became romantically involved and had an "on-again, off-again" relationship.

**¶3**      From the outset, Interval was paranoid and controlling. He constantly accused C.M. of cheating, called her "whore" and "a slut," and demanded that she get tested for sexually transmitted diseases. He would repeatedly show up unannounced at her place of work or call her workplace to check up on her.

**¶4**      Interval also accused several men of sleeping with C.M., often creating ruses to confront them. For example, while he was working as a ride-share driver, he picked up a passenger he suspected was sleeping with C.M. He sent a text message to the passenger a few days later, stating that

---

[1]    The Honorable Maurice Portley, Retired Judge of the Court of Appeals, Division One, has been authorized to sit in this matter pursuant to Article 6, Section 3, of the Arizona Constitution.

[2]    We review trial evidence in the light most favorable to sustaining the conviction. *See State v. West*, 226 Ariz. 559, 562, ¶ 16 (2011) (citation omitted).

C.M. admitted to sleeping with him and that he wanted "a chance to talk . . . man to man." The passenger denied sleeping with C.M. or even knowing her.

**¶5** Despite their tumultuous relationship, C.M. got pregnant in November 2015. Interval later convinced C.M. to move with him to be closer to his family, and the couple, with D.A., moved to Ohio. C.M. gave birth to a girl, S.I., in August 2016. Interval, however, refused to sign the birth certificate questioning whether he was the child's father.

**¶6** Shortly after the birth, C.M. returned to Arizona with her daughters, and Interval soon followed. Returning to Arizona did not improve the rocky relationship, and Interval pressured C.M. to send D.A. to live with her family in Jordan. He continued to accuse C.M. of infidelity and became increasingly paranoid that she would take S.I. and leave. He even lured a pest control exterminator to the house by falsely reporting bed bugs and told the man that he suspected him of sleeping with C.M. The exterminator denied knowing or sleeping with her.

**¶7** C.M. eventually told her sister, Suzann, that she wanted to break up with Interval. She contacted her property manager on May 6, 2017 about breaking her lease.

**¶8** Four days later, Interval sent a text message to his sister: "I had the perfect plan to finally end this psychopath tonight, but I didn't have the courage, so I took some Adderall to encourage my misbehavior." He also wrote that he suspected C.M. was watching him because she knew his every move and that he "almost spent life in prison" and needed to "get psych help stat." He subsequently sought directions to Canada, California, Montana, and Mexico and attempted to sell C.M.'s car online.

**¶9** C.M. and Suzann called police on the same day to inquire how to obtain an order of protection. They agreed to talk again the next day, May 11. When Suzann did not hear from C.M., she called her other two sisters, Mona and Sharon, and learned that C.M. had not dropped off S.I. with Sharon, who provided childcare for C.M. The sisters called C.M.'s work and learned she had not come to work that day.

**¶10** Alarmed, they drove to her house. When they arrived, they noticed her car parked in the driveway. One of the sisters knocked on the door, and Interval eventually answered. His arms were red and covered in scratches. He explained that C.M.'s car had a flat tire, and a friend had taken her to work that morning. But her sisters did not see anything wrong with the tires.

3

¶11 The sisters left the property and called the police. They saw Interval leave, so they went back to the house and started knocking on the windows and calling out C.M.'s name but got no response. When the police arrived, they picked the lock on the door, entered, and performed a welfare check. Officers discovered C.M.'s cell phone on the bathroom floor and confirmed that her car tires were full of air.

¶12 Interval subsequently returned home. He told police that C.M. left the house on foot earlier that morning after the two had gotten into an argument. He stated that he did not know where she was but suspected she had left him for a man named Mike. Police entered C.M. into the missing persons database.

¶13 The following day, May 12, Interval filled out paperwork to put his name on S.I.'s birth certificate. Later that day, during a second welfare check, he appeared nervous and told officers that it was a "[g]ood thing [C.M.] disappeared." Officers found C.M.'s purse on the couch, containing her wallet, checkbook, credit cards, license, social security card, health insurance cards, and toothbrush. Interval showed little, if any, concern for C.M. during that welfare check.

¶14 In the next few days, Interval attempted to sell some of his possessions and "gave his dog away." He called his sister and told her that he and C.M. had gotten into an argument. He explained that the argument had gone too far and that he "saw things he couldn't unsee." He then told his sister that he was not able to tell her the full story because he did not think she could "handle it."

¶15 After securing search warrants for the electronic devices belonging to C.M. and Interval, police discovered that Interval's phone had been wiped clean. Police, however, discovered two audio recordings on C.M.'s phone from the morning she disappeared. During one, Interval told C.M. that she would "face God someday" and implored her not to take his daughter away from him. He went on to tell her she still had time to make the right decisions for their daughter.

¶16 During the execution of a search warrant, luminol spraying revealed a large area of blood in one of the bedrooms of the house. DNA testing, however, was inconclusive. Inside the house, police also found C.M.'s birth certificate, passport, and various personal items—including her hairbrush, makeup, and clothes.

¶17 Using GPS monitoring, police were also able to determine where Interval went the day C.M. disappeared. He drove around,

4

sometimes in circles, in the car and with the trailer he used for his landscaping business. He drove past a trash transfer station three times before ultimately stopping at a retail store to purchase three "fitted" mattress covers. After driving around some more, Interval returned to the retail store and purchased two plastic mattress covers that were waterproof and zippable. None of the mattress covers were found.

¶18　　　　Interval then drove to a concrete pad near the area of the trash transfer station. He stopped there for about ten minutes and adjusted the trailer load. He then drove to the trash transfer station and deposited 440 pounds of household items, including a white armoire, but no landscaping refuse. An officer testified that after reviewing surveillance footage, he noticed "a white cloth-type thing on the driver side rear of the trailer" that looked "like the possible figure of a person laying inside the bag." The State's theory at trial was that Interval had placed C.M.'s body in the white armoire and transferred her body to the mattress covers while stopped at the concrete pad. The State posited that Interval then disposed of her body at the trash transfer station. And the shirt Interval was wearing that day, a brown, long-sleeved shirt, was never found.

¶19　　　　Police later found traces of blood on or in the trailer. By spraying luminol on C.M.'s car, the police found blood on the right, rear passenger seat. A cadaver dog also alerted to that area of the car, indicating the presence of human decay.

¶20　　　　There was a three-month search of the landfill, and canvassers, without any help from Interval, searched through forty-three million pounds of trash. C.M. had not been heard from since May 10, nor was her body ever found.

¶21　　　　Interval was charged with one count of first-degree murder. After a twenty-four-day trial, a jury found him guilty of second-degree murder, and he was sentenced to twenty-five years' imprisonment.

## DISCUSSION

¶22　　　　Interval contends that the superior court erred by (1) denying his motion for judgment of acquittal based on the *corpus delicti* rule, and (2) admitting Arizona Rule of Evidence 404(b) evidence of prior bad acts.

I.　　　　THE STATE PROPERLY ESTABLISHED THE *CORPUS DELICTI*.

¶23　　　　Interval contends that there was insufficient evidence presented to support his conviction for second-degree murder under the

*corpus delicti* rule. Specifically, he argues that the State failed to prove (1) that C.M. was dead, (2) that criminal activity caused her death, and (3) that Interval committed the murder.

**¶24** To establish the *corpus delicti* in a homicide case, the State, in its case-in-chief, must introduce evidence, other than the defendant's own incriminating statements, that raises a reasonable inference that the death in question actually occurred, that it was the result of criminal conduct—not by suicide or accident—and that someone committed the criminal act. *See State v. Hall*, 204 Ariz. 442, 453, ¶ 43 (2003); *State v. Nieves*, 207 Ariz. 438, 440, ¶¶ 7–8 (App. 2004).

**¶25** The *corpus delicti* rule prevents a conviction based solely on an individual's "uncorroborated confession or incriminating statement[s]." *State v. Morris*, 215 Ariz. 324, 333, ¶ 34 (2007) (citation omitted); *see also State v. Chappell*, 225 Ariz. 229, 234, ¶ 9 (2010). The concern is "that such a confession could be false and the conviction thereby lack fundamental fairness." *State v. Flores*, 202 Ariz. 221, 222, ¶ 5 (App. 2002) (citation omitted). Thus, "[a] defendant may not be convicted of a crime based upon an uncorroborated confession without independent proof of the *corpus delicti*, or the 'body of the crime.'" *Nieves*, 207 Ariz. at 440, ¶ 7 (citation omitted). And although the State need only establish a reasonable inference that the charged crime was actually committed, "all elements of the offense must be supported by independent evidence or corroborated admissions." *State v. Jones*, 198 Ariz. 18, 22, ¶ 12 & n.6 (App. 2000) (citation omitted).

**¶26** As a preliminary matter, Interval argues that the State was first required to present sufficient evidence of the elements of second-degree murder[3] before the superior court could admit his statements as evidence. We disagree. The State's showing does not need to be made before a defendant's statements are presented, so long as the State "ultimately submits adequate proof of the *corpus delicti* before it rests." *State*

---

[3] Although Interval was charged with first-degree murder, the jury returned a verdict of second-degree murder. Accordingly, any argument regarding whether the State sufficiently established the premeditation necessary for a first-degree murder conviction is now moot. *Cf. State v. Peltz*, 242 Ariz. 23, 27, ¶ 9 (App. 2017). And even if the superior court had granted Interval's motion for judgment of acquittal on the first-degree murder charge, "the lesser included offense would still be applicable." *See State ex rel. Thomas v. Duncan*, 216 Ariz. 260, 265, ¶ 15 n.7 (App. 2007).

*v. Carlson*, 237 Ariz. 381, 387, ¶ 8 (2015) (citation omitted); *see also Morris*, 215 Ariz. at 333, ¶ 34.

**¶27**        Here, the State presented sufficient evidence for a jury to infer that C.M. was dead.  Witnesses testified that they had not had any contact with her since her disappearance on May 11, 2017.  They also testified that C.M. would never leave her daughter or miss work unexpectedly.  And an officer testified that C.M. had not left the country since her disappearance, and officers contacted Jordanian police who indicated that C.M. was not in Jordan.

**¶28**        Moreover, police discovered all of C.M.'s personal belongings in her home, including her passport, credit cards, driver's license, cell phone, checkbook, and wallet.  *See, e.g.*, *State v. Nicely*, 529 N.E.2d 1236, 1243 (Ohio 1988) ("[T]he victim left her purse with medications, money, identification and other personal items at her place of work.  It is unlikely that such personal possessions would have been left behind if she had voluntarily left her husband.").  Additionally, an investigator performed a forensic financial audit on C.M.'s accounts and determined that she had not stockpiled money or hid funds to disappear.  The investigator also determined that all of C.M.'s financial activity ceased after May 10, 2017.  And despite an extensive search, C.M. was never found.  *See Commonwealth v. Rivera*, 828 A.2d 1094, 1104–05 (Pa. Super. Ct. 2003) (noting an unsuccessful, extensive search for victim tended to establish that the victim was dead).  Accordingly, based on the evidence presented, a jury could reasonably infer that C.M. was no longer alive.

**¶29**        The State also presented sufficient evidence from which a jury could infer that C.M. had been murdered by Interval.  The couple had a years-long tumultuous relationship in which Interval constantly accused C.M. of cheating.  Interval accused at least two men of sleeping with C.M., one of whom was accused in the weeks leadings up to C.M.'s disappearance, and both denied even knowing her.  *See, e.g.*, *Gov't of Virgin Islands v. Harris*, 938 F.2d 401, 417 (3d Cir. 1991) (noting that a "history of an unstable, stormy, or violent relationship between defendant and victim-wife" and a "defendant's statements concerning victim-wife's alleged infidelity" are significant factors in "prior 'no-body-required' case law") (citations omitted).

**¶30**        Interval was the last person to see C.M. alive.  *See Nicely*, 529 N.E.2d at 1243.  Shortly thereafter, surveillance footage revealed Interval disposing of "a white cloth-type thing" that looked "like the possible figure of a person laying inside the bag."  When he first interacted with the sisters

and then the police, Interval had scratches on his arms and appeared nervous. And although inconclusive, luminol testing showed a large presence of blood in one of the bedrooms, some on or in the trailer, and in C.M.'s car. A cadaver dog also alerted near the right, rear passenger seat area of C.M.'s car where blood was found.

¶31 Finally, Interval's actions both before and after C.M.'s disappearance were indicative of a consciousness of guilt. He attempted to sell some of his possessions and looked up directions to Mexico and Canada. He factory-wiped his phone to delete any data, and he sought to include his name on the child's birth certificate on May 12. Moreover, his conversations with his sister before and after C.M.'s disappearance suggested he was involved in her disappearance. Accordingly, the totality of the circumstantial evidence presented in this case provide a reasonable basis from which the jurors could infer that C.M. was dead and that her death resulted from Interval's criminal conduct. *See Hall*, 204 Ariz. at 453, ¶ 43 (explaining evidence supporting an inference of the *corpus delicti* can be circumstantial in a case involving evidence of a confession or admission); *Chappell*, 225 Ariz. at 234, ¶ 9 ("*Corpus delicti* can be established through circumstantial evidence.") (citation omitted).

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT.

¶32 Interval further contends that even if his statements are considered, the evidence presented was insufficient to survive a motion for judgment of acquittal. Specifically, he asserts that the State failed to produce substantial evidence that C.M. was dead and contends that she could have deliberately disappeared with no intention of returning to her former identity, returned to her home country of Jordan under another name, hidden with relatives, or died by suicide or accident.

¶33 A judgment of acquittal is appropriate "if there is no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1). Substantial evidence is direct or circumstantial evidence from which a reasonable jury could find each element of an offense proven beyond a reasonable doubt. *West*, 226 Ariz. at 562, ¶ 16. A conviction of second-degree murder requires proof that a defendant intentionally or knowingly caused the death of another person. *See* A.R.S. § 13-1104(A)(1), (2).

¶34 Although the physical evidence in this case tying Interval to the murder was minimal, "physical evidence is not required to sustain a conviction if the totality of the circumstances demonstrates guilt beyond a reasonable doubt." *Hall*, 204 Ariz. at 454, ¶ 49 (citation omitted). Here,

Interval's statements, coupled with the evidence discussed above, were sufficient to support the jury's verdict of second-degree murder. Interval told his sister that he "had the perfect plan to finally end this psychopath tonight, but [he] didn't have the courage, so [he] took some Adderall to encourage [his] misbehavior." He went on to tell her that he "almost spent life in prison" and needed to "get psych help stat." In fact, sometime before C.M.'s disappearance on May 11, 2017, Interval told C.M. that she would "face God someday" and that she still had time to make the right decisions. And after her disappearance, Interval told his sister that an argument between the two had gone too far and that he "saw things he couldn't unsee."

¶35 Additionally, Interval told C.M.'s sisters that a friend had picked her up because her car had a flat tire. But C.M.'s sisters and police reported that her tires were full of air and a vehicle service worker who conducted a tire analysis of C.M.'s car did not "see any defect to any of the tires." As the day went on, Interval told conflicting stories about where C.M. went the morning she disappeared, saying that she had left on foot, had been picked up by a friend, and had left him for a man named Mike.

¶36 Interval also appeared to be nervous when interacting with police and even told officers that it was a "[g]ood thing [C.M.] disappeared." Although C.M. was missing, Interval showed little, if any, emotion about her absence and did not assist in search efforts to find her body.

¶37 Thus, because substantial evidence supported the conviction, the superior court did not err by denying Interval's motion for judgment of acquittal.

III. THE COURT PROPERLY ADMITTED OTHER ACT EVIDENCE TO SHOW INTERVAL'S MOTIVE.

¶38 Interval also contends that the superior court erred by admitting other act evidence under Arizona Rule of Evidence 404(b). Typically, evidence of a defendant's "other crimes, wrongs, or acts" is inadmissible to prove action in conformity with those other acts. Ariz. R. Evid. 404(b). Other act evidence may, however, be admissible for other non-propensity purposes like motive, opportunity, intent, or identity. *See id.*; *see also State v. Ferrero*, 229 Ariz. 239, 245, ¶ 29 (2012). We review the admission of other act evidence for an abuse of discretion. *State v. VanWinkle*, 230 Ariz. 387, 392, ¶ 18 (2012).

**¶39**         Specifically, Interval argues that "[s]uspicion and anger about infidelity years before [C.M.]'s disappearance does not show '*motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident*' . . . for an offense allegedly motivated by concern over the possible loss of connection to his daughter years later."[4]   But Interval's history of suspicion about C.M.'s infidelity was relevant and admissible for the proper purpose of showing his motive and intent.  *See State v. Williams*, 183 Ariz. 368, 377 (1995) (noting that prior acts of aggression were properly admitted because they showed the defendant's animosity toward the victim).  Although the State is not required to prove motive in a murder prosecution, it remains relevant.  *See State v. Hargrave*, 225 Ariz. 1, 8–9, ¶ 14 (2010) (citing *State v. Hunter*, 136 Ariz. 45, 50 (1983)).  And at trial, the State presented a dual motive as to why Interval killed C.M.: (1) to prevent her from taking S.I. away from him, and (2) his obsession with C.M.'s suspected infidelities caused him to have developed extreme animosity toward C.M. over time.

**¶40**         Finally, while Interval's suspicions of infidelity occurred years before C.M.'s disappearance, "[t]he admissibility of such testimony is not measured by remoteness in time," and instead, "the length of time is a factor to be considered by the jury in determining the weight of the evidence."  *State v. Jeffers*, 135 Ariz. 404, 418 (1983) (citation omitted).  Consequently, we discern no error.

---

[4]      Although Interval generally asserts that "many prior acts of the defendant were admitted at trial," he fails to expound on what those bad acts were other than his suspicions of infidelity.  Our role, however, is not to develop a party's arguments, and merely mentioning an argument is insufficient to develop a claim.  *State v. Moody*, 208 Ariz. 424, 452, ¶ 101 n.9 (2004).  Accordingly, we do not address Interval's argument to the extent he alleges that all admitted 404(b) evidence was improper.

## CONCLUSION

¶41  Because substantial evidence supports Interval's conviction, and we find no reversible error, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA