SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-05-0267-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2003-011506 |
| CORY DEONN MORRIS, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| | ) | |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Douglas L. Rayes, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel, Capital
          Litigation Section
          Patricia A. Nigro, Assistant Attorney General
Attorneys for State of Arizona

SUSAN M. SHERWIN, MARICOPA COUNTY LEGAL ADVOCATE           Phoenix
     By   Consuelo M. Ohanesian, Deputy Legal Advocate
Attorneys for Cory Deonn Morris
_____

**M c G R E G O R**, Chief Justice

¶1      On July 19, 2005, a jury determined that Cory Morris should be sentenced to death for the murders of Barbara Codman, Shanteria Davis, Jade Velasquez, Sharon Noah, and Julie Castillo.  Appeal to this Court is automatic.  Ariz. R. Crim. P. 31.2.b.  We have jurisdiction pursuant to Article 6, Section 5, Clause 3 of the Arizona Constitution and Arizona Revised

Statutes (A.R.S.) section 13-4031 (2001).

## I.

## A.

¶2    Morris lived in a camper in the backyard of his aunt and uncle's house in Phoenix and worked at a bar approximately three nights a week.  In April 2003, Morris's boss noticed for the first time that Morris had a body odor problem.  Morris's aunt and uncle also noticed that Morris had a body odor problem that had become progressively worse since he began living with them six months earlier.

¶3    On April 12, 2003, when Morris's uncle went to the camper to find Morris, he smelled a "rotten odor" in the backyard and saw flies inside the window of the camper.  As he opened the door and stepped inside, he saw flies and maggots "boiling on the floor."  He discovered the decomposed body of Julie Castillo under a blanket.

¶4    On the same day, police officers questioned Morris about the body in his camper, as well as four other bodies that had been found nearby.  During this interview, Morris admitted to knowing the five victims and provided two versions of each victim's death.  In the first version, he claimed that each victim died of a drug overdose while he was away from the camper.  After discussing all five victims, the detective conducting the interview told Morris that he did not believe

2

him. Morris then stated that each victim asked him to choke her during sex and that each accidentally died as a result of this conduct. Morris also claimed that he used a condom during sex with the victims. We discuss each victim in turn.

**1.**

¶5    On September 11, 2002, police discovered Barbara Codman's naked, decomposed body in an alley between East McKinley and East Pierce Streets and west of 9th Street. The alley is located just north of Morris's residence. Police found drag marks from the sidewalk crossing the alley into the alley itself. Codman's body exhibited skin slippage[1] on her inner thighs and breast, and her head and neck were more decomposed than the rest of her body.

¶6    Morris said that he met Codman while walking at night and, for twenty dollars, she agreed to come to his camper and have sex with him. Morris first said that he went outside after he and Codman had sex and, when he returned, Codman was sitting naked on the bed using drugs. Morris told her to leave after she finished, and then he stepped outside. When he went back into the camper, Codman was sitting on the bed panting, and she

---

[1]    Skin slippage occurs when, in the postmortem phase, bacteria destroy connections between the skin and the underlying tissue so that, with pressure and movement, the skin begins to detach and slip off the body.

3

soon collapsed.  Morris dragged Codman out of the camper on a sleeping bag.

¶7     In his second version of events, Morris stated that Codman asked him to choke her with a necktie during sex.  He did so, and she collapsed and never regained consciousness.

¶8     Morris kept some of Codman's belongings, including her overalls, panties, and purse.  Analysts found Codman's DNA on some of the items.  When Morris was arrested, he was carrying Codman's social security card, driver's license, and check card in his wallet.

¶9     Because of the extensive decomposition of Codman's head and neck, Dr. John Hu, who performed her autopsy, was unable to conduct a detailed investigation for trauma in that region.  Hu originally determined that the cause of death was combined toxicity of morphine and cocaine and listed the manner of death as undetermined because the circumstances surrounding Codman's death were suspicious.  After the police gave Hu a transcript of Morris's statements, he determined that "the cause of death is most likely asphyxia due to ligature strangulation" because the autopsy results were not inconsistent with such a determination.

**2.**

¶10    On October 10, 2002, police found Shanteria Davis's naked, decomposed body in the same alley in which Codman's body

4

had been discovered. Davis had skin slippage on her back, buttocks, and the backs of her legs. Police found drag marks in the alley.

¶11 In his first version of events, Morris stated that, for five dollars, Davis agreed to come back to his camper and have sex with him. After they had sex, Morris left Davis alone in the camper for about an hour because she wanted to use drugs. When Morris returned, Davis was unconscious but breathing. Morris covered her and left for his friend's house. When he returned the next morning, Davis was dead. That night, he dragged her into the alley.

¶12 In his second version of events, Morris stated that Davis asked him to wrap her hair extensions around her neck while they were having sex. Davis died as a result of this conduct.

¶13 Police found hair extensions in Morris's camper. DNA under Davis's fingernails matched Morris's DNA. DNA analysis on panties found in Morris's camper could not exclude Davis as a source of the DNA.

¶14 Because of the extent of decomposition, Dr. Kevin Horn, who performed Davis's autopsy, could not determine whether Davis suffered any trauma. Based on the lack of visible trauma and the presence of cocaine and cocaine breakdown products in her spleen, Horn determined that the cause of death was cocaine

5

intoxication. After reviewing a transcript of Morris's statements to the police, Horn stated that nothing in his autopsy was inconsistent with strangulation.

**3.**

¶15     On February 27, 2003, police discovered the clothed body of Jade Velasquez on the west side of 9th Street, just outside the gate leading to the backyard where Morris's camper was located. Velasquez had ligature marks on the front and sides of her neck and bruising under her left eye. Police noted "some disturbance" in the ground near the gate to the backyard, which was consistent with removing the gate from its hinge and then replacing it. Police also noted grass scuff marks on the sidewalk, indicating that the body had been dragged. A detective spoke with Morris's aunt during the investigation of Velasquez's death.

¶16     Morris first stated that Velasquez, a friend, agreed to come to his camper for sex. He claimed that Velasquez was drunk when she arrived at the camper and passed out before having sex with him. According to Morris, he realized that Velasquez was dead when she did not wake up the next morning. He left for the day and moved her body to the street that night.

¶17     In his second version of events, Morris stated that Velasquez asked him to use his hands to choke her while they were having sex. Morris did so, and Velasquez passed out and

6

never regained consciousness. Morris put Velasquez's clothes back on her before he dragged her to the street because he knew her and did not want to leave her in the street unclothed.

¶18      DNA from semen on a vaginal swab taken from Velasquez's body matched Morris's DNA profile. Dr. Vladimir Shvarts, who performed Velasquez's autopsy, found petechial hemorrhages in her left eye and focal hemorrhagic areas inside her neck and determined that the cause of death was strangulation. Velasquez's blood tested positive for alcohol, cocaine metabolites, and benzodiazepines, but the combination of drugs was not sufficient to cause death.

**4.**

¶19      On March 29, 2003, police found Sharon Noah's naked body on the west side of 9th Street, approximately fifteen to twenty feet from the location at which Velasquez's body was discovered. There were ligature marks on Noah's neck and skin slippage on her inner thighs, breasts, and hips. Some maggots were present on her body, and her hand and foot were mummified. Some of Noah's artificial fingernails were broken.

¶20      Morris first stated that he met Noah, who had the mental age of a ten- or eleven-year-old, while out walking, and the two then went back to his camper and had sex. Afterwards, Morris left because Noah wanted to use drugs. Noah was dead when he returned. Morris then put a belt around Noah's neck and

pulled her body onto his sleeping bag. He dragged her body outside that night. He threw away most of her clothes but kept her shoes.

¶21    In his second version of events, Morris said that Noah suggested that he use the nylon strap attached to Morris's gym bag to choke her during sex. Morris did so, but when Noah's eyes closed, he stopped and noticed that she was no longer breathing. Morris left the strap on Noah's neck until he dragged her outside.

¶22    DNA on panties found in Morris's camper matched both Morris's and Noah's DNA profiles, and Morris's DNA profile matched DNA on a vaginal swab taken from Noah. Police also found broken fingernails in Morris's camper.

¶23    Noah's autopsy indicated that she died of ligature strangulation resulting in asphyxia. Toxicology reports showed that Noah had used cocaine before her death and that although she had GHB, which is often used in date rapes, in her system, drug overdose was not the cause of death. When asked how he would explain the extensive skin slippage on Noah's thighs, the medical examiner posited that some item may have contacted her thighs postmortem.

**5.**

¶24    The body discovered in Morris's camper on April 12, 2003, was that of Julie Castillo. The badly decomposed body was

face down and her buttocks were near the camper's fold-down bed. There was a necktie around her neck.

¶25     Morris first stated that he brought Castillo back to his camper because it was cold and she needed a place to spend the night.  Morris left the camper after Castillo asked if she could smoke crack, and when he returned, Castillo was unconscious on the floor.  He took her clothes off because she had urinated on herself.  The next day, he went to work, and when he returned, he realized that Castillo was dead.  Morris stayed in the camper that night.  When the detective conducting the interview asked whether Morris engaged in any sexual activity while Castillo's body was in the camper, Morris stated that he ejaculated in his sleep but was facing away from Castillo's body at the time.  Morris originally said that he never had sex with Castillo.

¶26     In his second version of events, Morris stated that Castillo asked him to choke her with a necktie during sex. Morris did so, and Castillo collapsed and never regained consciousness.  Morris kept Castillo's body in his camper for approximately five days before it was discovered.  He claimed that he had not been in the camper during the three days before the body's discovery.

¶27     Dr. Horn, who performed Castillo's autopsy, determined that Castillo had been dead "between three and seven" days at

9

the time the body was found. Based on information from the detectives, Horn determined that the cause of death was "probable ligature strangulation." Because of the extensive decomposition, there was no visible evidence of trauma. Castillo had a blood alcohol content of 0.12, and also had traces of cocaine in her system. Additionally, seven defects measuring up to three-eighths of an inch radiated around Castillo's anus. Horn could not determine whether the defects resulted from trauma or normal decomposition.

**B.**

¶28    A grand jury indicted Morris for five counts of first degree murder. During the guilt phase of the trial, the prosecution played videotapes of Morris's descriptions of each woman's death. Morris did not present a defense, but his counsel moved for acquittal on all counts pursuant to Arizona Rule of Criminal Procedure 20.a. The judge denied the motion. The jury then found Morris guilty on all five counts.

¶29    At the close of the aggravation phase of the trial, the jury unanimously found that Morris had been convicted of prior serious offenses, A.R.S. § 13-703.F.2 (Supp. 2004), based on the five convictions from the guilt phase of the trial, and that he committed all five murders in both an "especially cruel" and "especially heinous or depraved" manner, *id.* § 13-703.F.6. With respect to the especially cruel prong, Dr. Keen testified

10

that strangulation victims are conscious for at least a short period and experience pain before they lose consciousness. With respect to the heinous and depraved prong, the prosecutor argued that Morris kept the bodies after they began to decompose because he enjoyed the odor of decomposition. He also argued that Morris had sexual intercourse with all of the corpses except for Davis's. The prosecutor focused on the selective skin slippage on the bodies and the presence of semen on some of the victims despite Morris's insistence that he used condoms during sex.

¶30    In the penalty phase, Morris's mitigation evidence focused on the responsibilities placed on him at a young age; his problems with his appearance and hygiene, particularly his problems with body odor; his desire to improve himself; and his good work record.[2]

¶31    The jury determined that Morris's mitigation evidence was not sufficiently substantial to call for leniency and that death was the appropriate sentence for each of the five murders. *See* A.R.S. § 13-703.01.G, .H (Supp. 2004).[3]

---

[2]    Prior to trial, Morris declined to participate in IQ testing or psychological evaluation.

[3]    The trial judge also found that Morris had violated the terms of probation imposed after a 2002 theft conviction. He revoked Morris's probation and imposed a presumptive sentence of one year for theft.

¶**32**     Morris raises four issues on appeal.  We first address his claim that the State presented insufficient evidence of the corpus delicti for the deaths of Codman and Davis.  Next, we consider his claim that prescreening prospective jurors to determine which ones could serve for the length of the trial violated his right to be present at all stages of the criminal proceeding against him.  We then address Morris's argument that the prosecutor engaged in misconduct.  Finally, we evaluate the claim that the trial court abused its discretion in admitting excessively gruesome photographs.

**A.**

¶**33**     Morris contends that the trial court erred in admitting his statements concerning the deaths of Codman and Davis because the State did not establish the corpus delicti for those murders.  We review a ruling on the sufficiency of the evidence of corpus delicti for abuse of discretion.  *State v. Gerlaugh*, 134 Ariz. 164, 169-70, 654 P.2d 800, 805-06 (1982); *see also State v. Gillies*, 135 Ariz. 500, 505-06, 662 P.2d 1007, 1012-13 (1983).

¶**34**     The corpus delicti doctrine ensures that a defendant's conviction is not based upon an uncorroborated confession or incriminating statement.  *State v. Hall*, 204 Ariz. 442, 453 ¶ 43, 65 P.3d 90, 101 (2003) (citing *Smith v. United States*, 348

U.S. 147, 152 (1954)). Therefore, the State must show that the "alleged injury to the victim . . . was caused by criminal conduct rather than by suicide or accident." *Id.* "[O]nly a reasonable inference of the corpus delicti need exist" before incriminating statements may be considered, and circumstantial evidence can support such an inference. *Id.* (quoting *Gillies*, 135 Ariz. at 506, 662 P.2d at 1013). Furthermore, the State need not present evidence supporting the inference of corpus delicti before it submits the defendant's statements "[a]s long as the State ultimately submits adequate proof of the *corpus delicti* before it rests." *Id.* (quoting *State v. Jones ex rel. County of Maricopa*, 198 Ariz. 18, 23 ¶ 14, 6 P.3d 323, 328 (App. 2000)). The corpus delicti doctrine does not require the State to prove the cause of death. *State v. Atwood*, 171 Ariz. 576, 598-99, 832 P.2d 593, 615-16 (1992), *disapproved on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241 ¶ 25, 25 P.3d 717, 729 (2001).

¶35     Here, sufficient evidence independent of Morris's incriminating statements establishes corpus delicti for the deaths of both Codman and Davis. Both died under suspicious circumstances and were discovered naked in the same alley. Drag marks near both bodies indicated that they had been moved. DNA on panties and overalls found in Morris's camper matched Codman's DNA, DNA on panties found in the camper matched Davis's

DNA, and Davis had Morris's DNA under her fingernails. Hair extensions similar to Davis's were found in the camper. Morris was carrying Codman's driver's license, social security card, and check card when he was arrested.

¶36 Morris argues that, despite the other evidence that these two deaths resulted from criminal conduct, the State cannot establish corpus delicti because the medical examiners believed that both deaths resulted from drug overdoses before police gave them transcripts of Morris's statements. The State, however, need not prove cause of death to establish corpus delicti. *See id*. Instead, the State need only present evidence sufficient to raise a "reasonable inference" that the death resulted from criminal activity. *Hall*, 204 Ariz. at 453 ¶ 43, 65 P.3d at 101 (quoting *Gillies*, 135 Ariz. at 506, 662 P.2d at 1013). Given the evidence here, the State met its burden even if we disregard the medical examiners' testimony.[4] Therefore, the trial court did not abuse its discretion in admitting

_____

[4]     Although Morris argues that *State v. Nieves*, 207 Ariz. 438, 87 P.3d 851 (App. 2004), controls the resolution of this issue, we disagree. In *Nieves*, the medical examiner based his conclusion about cause of death solely on the defendant's statements*. Id.* at 441 ¶¶ 14-15, 87 P.3d at 854. Because there was no evidence of criminal activity other than the medical examiner's testimony, the court held that the State failed to establish the corpus delicti. *Id.* at 444 ¶¶ 28-29, 87 P.3d at 857. Here, conversely, evidence independent of the medical examiners' testimony supports criminal activity in the deaths of both Codman and Davis.

14

Morris's statements as to the deaths of Codman and Davis.

**B.**

¶37     We next consider whether Morris's absence during the jury commissioner's prescreening of prospective jurors to determine whether they could serve on a lengthy trial violated his right to be present at all stages of the criminal proceeding.  Because the trial was expected to last six to eight weeks, the judge ordered the jury commissioner to poll the jurors to identify those who claimed that they could not serve for such a long trial.  The jury commissioner gave those jurors one-page questionnaires on which they could state the reasons for their inability to serve.  The lawyers then reviewed the questionnaires for potentially invalid excuses and submitted those questionnaires to the judge for further review.

¶38     After reviewing the questionnaires, the judge determined that approximately twenty prospective jurors had provided questionable excuses.  When he asked the jury commissioner to send those twenty individuals to the courtroom for further questioning, the jury commissioner informed him that only four of the twenty were available.  The jury commissioner had released the remaining sixteen to other panels.

¶39     Defense counsel admitted that he could not identify any group excluded from service or show that the jury did not represent a cross-section of the community, but objected to the

15

prescreening procedure because it left only "volunteers" as prospective jurors. The trial judge rejected this challenge.

¶40      Although a "defendant in a criminal case is entitled to a fair and impartial jury for the trial of his case, . . . he is not entitled to be tried by any particular jury." *Atwood*, 171 Ariz. at 624, 832 P.2d at 641 (quoting *State v. Arnett*, 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978)). To make a prima facie showing that a jury does not represent a fair cross-section of the community, a defendant must show each of the following:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

¶41      Morris has neither identified a distinctive group that was excluded from his jury panel nor claimed that the jury he received was not fair and impartial. Therefore, he has failed to satisfy even the first prong of *Duren*. *See State v. Wooten*, 193 Ariz. 357, 361-62 ¶¶ 20-24, 972 P.2d 993, 997-98 (App. 1998) (rejecting claims that a jury commissioner's prescreen of prospective jurors for length of the trial excluded poor and minority jurors because the defendant failed to satisfy any of the *Duren* prongs).

16

¶42     Moreover, jury commissioners have broad discretion to excuse jurors from service:

> If a person's answers to a questionnaire indicate that the person is unqualified for jury service or, in the opinion of the judge or *jury commissioner*, state grounds sufficient to be excused from jury service, the person's name shall not be included on the qualified juror list and the person shall be notified that he is excused from jury service.

A.R.S. § 21-315.A (Supp. 2006) (emphasis added); *see also Wooten*, 193 Ariz. at 362-63 ¶¶ 25-26, 972 P.2d at 998-99 (rejecting defendant's claim that jury commissioner's prescreening of prospective jurors violated his due process rights based in part on the jury commissioner's broad statutory power to excuse jurors from service). Because the jury commissioner decided to excuse prospective jurors solely on the basis of their ability to serve on a lengthy trial, a neutral criterion, he properly exercised his discretion. *See State v. Murray*, 184 Ariz. 9, 23-24, 906 P.2d 542, 556-57 (1995) (noting that "[g]ranting excuses based on the application of neutral criteria to prospective jurors' individual situations" is a proper exercise of the jury commissioner's discretion (quoting *State v. Sanderson*, 182 Ariz. 534, 539, 898 P.2d 483, 488 (App. 1995))).

¶43     Even if Morris could show that certain prospective jurors were wrongly excused, we would not reverse his convictions unless he could also show actual prejudice, i.e.,

17

that the jurors who actually served were not fair and impartial. *State v. Webb*, 101 Ariz. 307, 309, 419 P.2d 91, 93 (1966); *State v. Fendler*, 127 Ariz. 464, 470-71, 622 P.2d 23, 29-30 (App. 1980) (extending "actual prejudice" doctrine to excusals by jury commissioner).  Because Morris is unable to demonstrate any actual prejudice resulting from the jury commissioner's prescreening of prospective jurors, his challenge fails.

¶44    Morris argues that his exclusion from the prescreening process violates his right to be present at all stages of the proceeding against him.  We have previously held that exclusion from the entire jury selection process is structural error, but in so holding we noted that exclusion from a "minor portion" of jury selection proceedings may be harmless error.  *State v. Garcia-Contreras*, 191 Ariz. 144, 148 ¶ 17, 953 P.2d 536, 540 (1998) (quoting *State v. Ayers*, 133 Ariz. 570, 571, 653 P.2d 27, 28 (App. 1982)).  "An error is harmless if it appears 'beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained.'"  *State v. Dann*, 205 Ariz. 557, 565 ¶ 18, 74 P.3d 231, 239 (2003) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

¶45    Here, Morris attended all aspects of jury selection except the prescreening process, which focused solely on the length of the trial and did not involve questioning the jurors about the facts or legal issues of the case.  Thus, even

18

assuming that he was entitled to attend the prescreening process, an issue we do not reach, any error is harmless because no basis exists on which we could conclude that Morris's exclusion from that process affected the verdict.

## C.

¶46    Morris next identifies five instances of alleged prosecutorial misconduct. "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *State v. Hughes*, 193 Ariz. 72, 79 ¶ 26, 969 P.2d 1184, 1191 (1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (quoting *Atwood*, 171 Ariz. at 611, 832 P.2d at 628). Prosecutorial misconduct constitutes reversible error only if (1) misconduct exists and (2) "a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 340 ¶ 45, 111 P.3d 369, 382 (quoting *Atwood*, 171 Ariz. at 606, 832 P.2d at 623), *cert. denied*, 126 S. Ct. 193 (2005).

¶47    We evaluate each instance of alleged misconduct, and the standard of review depends upon whether Morris objected. If

19

he objected, then the issue is preserved for review under the standard articulated in *Anderson II*. *Id.* at 340-41 ¶ 45, 111 P.3d at 382-83. If Morris did not object, then we review only for fundamental error. *State v. Roque*, 213 Ariz. 193, 228 ¶ 154, 141 P.3d 368, 403 (2006). We also address the cumulative effect of misconduct:

> [E]ven if there [is] no error or an error [is] harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and "did so with indifference, if not a specific intent, to prejudice the defendant."

*Id.* at ¶ 155 (citation omitted) (quoting *Hughes*, 193 Ariz. at 80 ¶ 31, 969 P.2d at 1192).

## 1.

¶48 Morris argues that the prosecutor improperly influenced the medical examiners investigating the deaths of Codman and Davis by providing them copies of the statements Morris made to the police. Dr. Hu, who performed Codman's autopsy, and Dr. Horn, who performed Davis's autopsy, originally determined that the cause of death for each woman was drug overdose. After police provided them transcripts of Morris's statements regarding the deaths, the medical examiners testified that they found nothing inconsistent with asphyxiation due to strangulation as the cause of death for both women. Morris did

20

not object at trial, so we review for fundamental error. *Id*. at ¶ 154.

**¶49** Arizona statutes permit medical examiners to receive information about the circumstances surrounding a suspicious death. Arizona Revised Statutes section 11-593.B (2001) requires a peace officer to report the results of "an investigation of the facts and circumstances surrounding [a suspicious] death" to the county medical examiner. Moreover, the medical examiner is statutorily required to "[m]ake inquiries regarding the cause and manner of death." A.R.S. § 11-594.A.4 (2001); *see also id.* § 11-594.A.2. The prosecutor did not, therefore, engage in misconduct by giving transcripts of Morris's statements to the medical examiners. Moreover, the record does not suggest that Morris's statements improperly influenced either of the medical examiners. Both testified simply that they found nothing inconsistent with those statements in their respective autopsies of Codman and Davis, and they acknowledged that, without the statements, they would have believed that drug intoxication caused the deaths. Therefore, this incident does not constitute prosecutorial misconduct.

## 2.

**¶50** In the aggravation phase, the prosecutor argued that Morris murdered the victims in order to have sexual intercourse

21

with their corpses.  Morris claims that this argument had no basis in fact.  Morris failed to object to the argument at trial, so we review for fundamental error.  *Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.

¶51     Prosecutors have "wide latitude" in presenting their arguments to the jury.  *State v. Jones*, 197 Ariz. 290, 305 ¶ 37, 4 P.3d 345, 360 (2000).  The prosecutor is permitted to argue "all reasonable inferences from the evidence," but cannot "make insinuations that are not supported by the evidence."  *Hughes*, 193 Ariz. at 85 ¶ 59, 969 P.2d at 1197.  In evaluating the propriety of a prosecutor's arguments, we consider "whether the remarks called to the jurors' attention matters that they should not consider, and whether, 'under the circumstances of the particular case, [the remarks] probably influenced' the jurors."  *Roque*, 213 Ariz. at 224 ¶ 128, 141 P.3d at 399 (alteration in original) (quoting *Sullivan v. State*, 47 Ariz. 224, 238, 55 P.2d 312, 317 (1936)).

¶52     While the evidence in this case does not compel the conclusion that Morris engaged in intercourse with the corpses of the victims, the record includes sufficient evidence to permit the prosecutor to make such an argument.[5]  The prosecutor

---

[5]     At trial, the State did not argue that Morris engaged in intercourse with Davis's body and made it clear to the jury that it did not have sufficient evidence to support such an inference.

22

relied in part on skin slippage on selective parts of the victims' bodies as evidence that Morris engaged in intercourse with the corpses. Selective skin slippage existed on Codman's inner thighs and breast and on Noah's inner thighs. The medical examiners testified that skin slippage can result from friction and the general decomposition process.

¶53 The prosecutor also relied on the skin defects on Castillo's anus, although the medical examiner was unable to determine whether those defects were caused by trauma or decomposition. In his statement to police, Morris also mentioned that he either masturbated or ejaculated in his sleep after Castillo died but while she was still in his camper. Castillo's buttocks were level with Morris's bed.

¶54 Additionally, the prosecutor relied on DNA evidence showing Morris's semen was present in Velasquez's and Noah's vaginas, even though Morris insisted that he wore a condom during sex with the women before their deaths. Thus, the proposition that Morris had intercourse with the corpses of Codman, Velasquez, Noah, and Castillo is a "reasonable inference" to be drawn from the evidence in the record, and the prosecutor did not act improperly in making this argument.

¶55 Furthermore, the judge instructed the jury that the lawyers' arguments were not evidence to be considered in reaching its conclusions. *See State v. Newell*, 212 Ariz. 389,

23

403 ¶¶ 67-68, 132 P.3d 833, 847 (holding that jury instructions stating that closing arguments are not evidence negated improper comments of prosecutor), *cert. denied*, 127 S. Ct. 663 (2006); *Anderson II*, 210 Ariz. at 342 ¶ 50, 111 P.3d at 384 (holding that jury instructions that the lawyer's statements are not evidence cured the prosecutor's misstatement of the law). Jurors are presumed to follow the judge's instructions. *Newell*, 212 Ariz. at 403 ¶ 68, 132 P.3d at 847. Therefore, we presume that the jurors reached their own conclusions regarding the strength of the evidence. Even if the prosecutor's comments were improper, the judge's instructions negated their effect.

**¶56** Finally, the prosecutor's arguments were directed only toward establishing the "heinous or depraved" prong of the F.6 aggravator. Because the jury determined that each murder was committed in an especially cruel manner and because a finding of cruelty alone is sufficient to establish the F.6 aggravator, *see infra* ¶¶ 61, 79-80, the prosecutor's arguments were, at worst, harmless error.

### 3.

**¶57** Morris also argues that, during rebuttal to defense counsel's closing argument in the aggravation phase, the prosecutor invited jurors to put themselves in the place of the victims and singled out specific jurors based on appearance and gender. The prosecutor made the challenged comments while

responding to defense counsel's argument that the jurors could not determine whether the victims suffered because they were intoxicated when they were killed. Defense counsel did not object to these statements, so we review for fundamental error. *Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.

¶58     A prosecutor has wide latitude in presenting arguments to the jury, including commenting on the "vicious and inhuman nature of the defendant's acts," but cannot make arguments that appeal to the fears or passions of the jury. *State v. Comer*, 165 Ariz. 413, 426, 799 P.2d 333, 346 (1990). Although the State argues that the prosecutor simply asked the jurors to apply common sense to the factual situation before them, the prosecutor's remarks did far more than make that request. Instead, the prosecutor singled out particular jurors and addressed them personally,[6] playing on their sympathy for the

---

[6]     For example, the prosecutor asked:

[W]hich one of you wants to volunteer? I want a show of hands on this one. Which one of you ladies—and we don't need guys on this one, because he didn't take guys. He only took women.
        Which one of you want [sic] to volunteer to come sit here and have the defendant sit himself on your chest and say, Oh, that didn't hurt? Because the defense attorney is saying throw common sense out of [the] window. Which one? I challenge anybody to say, That is something I want to do.
        And anyway, and on top of that, while he's sitting on my chest, which one of you, since the one lower left-hand side has the longer hair of the jurors, maybe she wants to have him grab her hair

25

victims and fears of the defendant.  Such remarks constitute misconduct.

¶59     Because Morris did not object, however, we must determine whether this misconduct constitutes fundamental error. Morris bears the burden of persuasion and must "establish both that fundamental error exists and that the error in his case caused him prejudice."  *State v. Henderson*, 210 Ariz. 561, 567 ¶ 20, 115 P.3d 601, 607 (2005).  Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial."  *Id.* at ¶ 19 (quoting *State v. Hunter*, 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984)).

¶60     The prosecutor's comments here do not constitute fundamental error.  Morris has not shown that this isolated

---

while he's sitting on her chest . . . to grab it and pull it around her neck.
    You think that's not going to hurt?  You think one of you guys is going to volunteer for that?  You can't leave your common sense aside.  [Defense counsel] wants you to because he makes these arguments and says, well, we don't know what is in their heads. We don't know what is in Juror Number 1's head.  Can you tell me you don't think it's not going to hurt when he sits on you?
    Hey, Juror Number 1 or Juror Number 14, whatever it is, what if we put Winnie the Pooh tie around your neck? Are you going to enjoy that?  Are you going to like it?  Going to feel real good when you can't breathe?

26

incident of impropriety denied him a fair trial or deprived him of a right essential to his defense.

¶61　　　Additionally, Morris cannot establish prejudice. The prosecutor's argument was directed toward proof of cruelty. To prove that a murder was "especially cruel" under A.R.S. § 13-703.F.6, the State must show that the victim was conscious and suffered physical pain or mental anguish during at least some portion of the crime and that the defendant knew or should have known that the victim would suffer. *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997). Here, independent of the prosecutor's improper argument, the State presented overwhelming evidence of cruelty. The medical examiner testified that all of the victims would have experienced pain for some period before losing consciousness. Moreover, the evidence suggests that at least three of the victims struggled with Morris before losing consciousness: Morris's DNA was under Davis's fingernails, Noah's fingernails were broken, and the side of Velasquez's face was bruised. Morris has not met his burden of showing that the argument caused prejudice.

## 4.

¶62　　　Morris next argues that the prosecutor committed misconduct during the guilt phase when he introduced Castillo's jacket solely to inflame the jury. The prosecutor admitted his misconduct, Morris argues, when he told the jury during his

27

closing argument that he had offered the jacket for the jury's "smelling pleasure."[7]  Defense counsel did not object during the prosecution's statement, but did discuss the comment during his closing argument, noting that the odor on the jacket resulted in part from storing the jacket in a bag for a long period. Because defense counsel did not object to the prosecutor's comments, we review for fundamental error.  *Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.

¶63     The prosecutor originally introduced the jacket to show that it belonged to Castillo.  During the testimony of a police officer who investigated the scene of Castillo's death, the prosecutor introduced a booking photograph of Castillo wearing the jacket and then asked the officer to remove the jacket from its plastic bag and hold it up.  The prosecutor quickly asked the detective to return the jacket to the bag.

---

[7]     The prosecutor stated:

> But one of the things that is interesting about [Castillo] is that the smell is absolutely putrid, absolutely one of the worst things that you will ever probably experience.  And you got a minimal exposure to it when the jacket was opened up for your, if you will, smelling pleasure, for lack of a better word.
> And what ended up happening—you could tell it was a very strong odor about it.  So with regard to Julie Castillo, one of the things that happened to her is that she was wearing that jacket, and the reason that we pulled it out to show it to you, because the sleeves were inside out, and what that means is that he killed her.

There was no misconduct in introducing the jacket into evidence.

¶64    At worst, the offhand "smelling pleasure" comment was inappropriate. It does not, however, rise to the level of fundamental error because this single remark did not deprive Morris of a fair trial. Moreover, overwhelming evidence established that the strong odor associated with the jacket resulted from its close proximity to Castillo's badly decomposed body. Given this evidence, Morris cannot establish that the prosecutor's comment resulted in prejudice.

**5.**

¶65    Finally, Morris notes that on June 15, 2005, during the guilt phase of the trial, the prosecutor kept on his table, in view of the jury, an excluded photograph showing a maggot infestation. During a bench conference with the judge on another matter, defense counsel objected and the court ordered the prosecutor to move the photograph from the jury's view. The prosecutor did so. Because of the objection, Morris preserved this incident of alleged prosecutorial misconduct. *Id.*

¶66    Nothing in the record indicates that any juror actually saw the challenged photograph. Defense counsel did not ask the trial judge to determine whether any jurors had seen the photograph or to instruct the jurors to disregard it. The prosecutor complied with the judge's order to remove the photograph from view, and nothing indicates that he

intentionally left it on his desk or that he repeated this conduct at any other point in the trial. Given these circumstances, this incident does not constitute misconduct requiring reversal.

## 6.

¶67    We finally consider whether "persistent and pervasive" misconduct occurred and whether the "cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and 'did so with indifference, if not a specific intent, to prejudice the defendant.'" *Id.* at ¶ 155 (quoting *Hughes*, 193 Ariz. at 80 ¶ 31, 969 P.2d at 1192). Because Morris has described only one incident of misconduct, we cannot conclude that the prosecutor engaged in "persistent and pervasive" misconduct. Moreover, given the overwhelming evidence of Morris's guilt and of the cruelty of the murders, the challenged remarks by the prosecutor did not prejudice Morris.

## D.

¶68    Morris also claims that the trial judge abused his discretion by allowing the State to introduce excessively gruesome photographs of the bodies throughout the trial. Morris argues that the photographs had no evidentiary value because they did not show the cause of death or the identity of the victims.

¶69    We review a trial judge's decision to admit photographs for abuse of discretion. *State v. Hampton*, 213 Ariz. 167, 173 ¶ 17, 140 P.3d 950, 956 (2006), *cert. denied*, 127 S. Ct. 972 (2007).  We look to three factors to determine whether the trial judge erred in admitting the photographs: "the photograph's relevance, its tendency to inflame the jury, and its probative value compared to its potential to cause unfair prejudice."  *Id.*

¶70    Photographs of a victim's body are always relevant because "the fact and cause of death are always relevant in a murder prosecution."  *State v. Spreitz*, 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997) (quoting *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983)).  Additionally, photographs of a victim's body may be introduced

> to prove the corpus delicti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed.

*Chapple*, 135 Ariz. at 288, 660 P.2d at 1215.  If, however, the photographs have "no tendency to prove or disprove any question which is actually contested, they have little use or purpose except to inflame and would usually not be admissible."  *Id.* Gruesome or inflammatory photographs may be admitted, but if they are "admitted for the sole purpose of inflaming the jury,

31

[the Court] will reverse on appeal." *Gerlaugh*, 134 Ariz. at 169, 654 P.2d at 805.

¶71     None of the photographs to which Morris specifically objects on appeal, all of which are of Noah's body, are gruesome.[8] Four show Noah's hands or feet and one shows her nude body from a distance. All of the photographs provide information about the time and manner of death or otherwise corroborate the State's case. *See Anderson II*, 210 Ariz. at 340 ¶ 41, 111 P.3d at 382 (holding that photographs showing extensive decomposition, including skin slippage, bloating, and discoloration were relevant to "corroborate the State's theory of the case"). Moreover, the trial judge carefully analyzed each photograph for purposes of Arizona Rule of Evidence 403[9] and determined that any prejudicial effect did not substantially outweigh the probative value. On this record, we cannot conclude that the trial judge abused his discretion in admitting

---

[8]     Morris also argues that some photographs that were marked as exhibits but not admitted at trial are gruesome. Morris cannot establish prejudice from exhibits never admitted into evidence.

[9]     Arizona Rule of Evidence 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

the photographs.

## III.

¶72    If a jury imposes the death penalty for murders committed before August 1, 2002, this Court independently reviews the jury's findings of aggravating and mitigating circumstances and the propriety of the death sentence. A.R.S. § 13-703.04 (Supp. 2006); 2002 Ariz. Sess. Laws 2092, 2099, 5th Spec. Sess., ch. 1, § 7.B (noting that A.R.S. § 13-703.04 applies to offenses committed before August 1, 2002). For capital offenses committed on or after August 1, 2002, however, the Court no longer conducts independent review. *See* 2002 Ariz. Sess. Laws 2092, 2099, 5th Spec. Sess., ch. 1, § 7.C (noting that A.R.S. § 13-703.05 is effective on August 1, 2002 and applies to offenses committed on or after that date). Instead, A.R.S. § 13-703.05 (Supp. 2006), which the legislature adopted as part of a larger bill addressing the constitutional defects of Arizona's capital sentencing scheme in light of *Ring v. Arizona*, 536 U.S. 584 (2002), governs our review of these cases. *See* 2002 Ariz. Sess. Laws 2092, 2099, 5th Spec. Sess., ch. 1, § 9.A.1. Because Morris committed all five murders after August 1, 2002, we follow the standard of review set out in section 13-703.05.

¶73     Section 13-703.05 states:

> A.    The supreme court shall review all death sentences to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death.
>
> B.    If the supreme court determines that an error occurred in the sentencing proceedings, the supreme court shall determine whether the error was harmless beyond a reasonable doubt.  If the supreme court cannot determine whether the error was harmless beyond a reasonable doubt, the supreme court shall remand the case for a new sentencing proceeding.

¶74     This is the first case in which we consider our role under section 13-703.05.  The primary goal of statutory interpretation is to effect the intent of the legislature. *State v. Williams*, 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993). If the language of a statute is plain and unambiguous, we look no further.  *Id.*

¶75     Other than his claim of persistent and pervasive prosecutorial misconduct, Morris raises no challenges to the aggravation or penalty phases of his trial.  We must therefore initially determine whether the statute requires us to review the sentencing portion of the trial even when a defendant fails to raise issues related to those matters.

¶76     The statute provides that this Court "*shall* review *all* death sentences" under the abuse of discretion standard.  A.R.S. § 13-703.05.A (emphasis added).  Because the statute contains

mandatory language, we conclude that we are required to determine whether the jury abused its discretion, even though Morris failed to challenge the jury's decision with regard to either the aggravating factors or the imposition of the death sentences.[10] *See, e.g., Ins. Co. of N. Am. v. Superior Court*, 166 Ariz. 82, 85, 800 P.2d 585, 588 (1990) (noting that "shall" is presumably mandatory).

**B.**

¶77    Because we conclude that the statute mandates our review, we first consider whether the jury abused its discretion in finding the aggravating circumstances.  Under this standard of review, we uphold a decision if there is "any reasonable evidence in the record to sustain it."  *State v. Veatch*, 132 Ariz. 394, 396, 646 P.2d 279, 281 (1982).  Here, the jury found that the State proved two aggravators beyond a reasonable doubt: Morris committed prior serious offenses, A.R.S. § 13-703.F.2, and Morris committed each of the murders in an especially heinous, cruel or depraved manner*, id.* § 13-703.F.6.

¶78    The jury did not abuse its discretion in finding the

---

[10]    Our conclusion that section 13-703.05 requires us to review the sentence regardless of Morris's failure to raise arguments against it should not be understood to relieve death penalty counsel of the duty to raise all meritorious arguments against a death sentence.  *See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* Guideline 10.11.L (2003)  ("Counsel at every stage of the case should take

35

F.2 aggravator. The State properly used the multiple murder convictions from the guilt phase as prior serious offenses. *See id.* § 13-703.F.2 ("Convictions for serious offenses . . . not committed on the same occasion but consolidated for trial with the homicide . . . shall be treated as a serious offense under this paragraph."). Certainly, reasonable evidence supports the jury's decision that the State proved the F.2 aggravator.

¶79 We likewise conclude that the jury did not abuse its discretion in finding that the State proved the F.6 aggravator beyond a reasonable doubt. The jury made separate findings that the State had proved (1) cruelty and (2) heinousness or depravity. As noted earlier, the State establishes especial cruelty by showing that a victim was conscious and suffered physical pain or mental anguish before death and that the defendant knew or should have known that the victim would suffer. *Trostle*, 191 Ariz. at 18, 951 P.2d at 883. With respect to the cruelty prong, the State presented expert evidence that strangulation victims remain conscious and experience pain for at least some period of time. Additionally, the State presented evidence that Davis, Velasquez, and Noah struggled with Morris. Therefore, the evidence in the record supports the jury's finding of cruelty in each of the five

advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.").

36

murders.

¶80     A finding of cruelty alone is sufficient to establish the F.6 aggravator.  We therefore need not address whether the jury abused its discretion in finding that the murders were also heinous or depraved.  *Cf. Newell*, 212 Ariz. at 405-06 ¶¶ 84-85, 132 P.3d at 849-50 (noting, during independent review, that a finding of cruelty alone establishes the F.6 aggravator).

C.

¶81     The statute also directs us to consider whether the jury abused its discretion when it imposed a sentence of death for each of the murders.  Although Morris presented mitigation evidence, the jury necessarily determined that it was not sufficiently substantial to call for leniency.  *See* A.R.S. § 13-703.E (noting that the trier of fact imposes a death sentence if it finds at least one aggravating circumstance and determines that the mitigating circumstances are not "sufficiently substantial to call for leniency").  The decision to impose the death penalty once the jury finds aggravating factors is a matter for each individual juror to consider.  *See id.* § 13-703.C (stating that "[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty").  Therefore, we will not reverse the jury's decision so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently

37

substantial to call for leniency.

¶82    Here, Morris presented mitigation evidence relating to long-standing problems with his appearance and hygiene, the responsibilities placed on him at a young age, his desire to improve himself, and his good work record. Given the nature and strength of the aggravating factors for each murder, a reasonable jury could have determined that this mitigation evidence was not sufficiently substantial to call for leniency. Therefore, we cannot say that the jury abused its discretion in imposing death sentences for each of the murders.

## IV.

¶83    For purposes of federal review, Morris raises the following fourteen challenges to the constitutionality of Arizona's death penalty scheme. He concedes that this Court has previously rejected these arguments.

¶84    (1) The fact-finder in capital cases must be able to consider *all* relevant mitigating evidence in deciding whether to give the death penalty. *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). The trial court's failure to allow the jury to consider and give effect to *all* mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments. We rejected this argument in *State v. McGill*, 213 Ariz. 147, 161 ¶ 59, 140 P.3d 930, 944 (2006), *cert.*

38

*denied*, 127 S. Ct. 1914 (2007). *See also State v. Medina*, 193 Ariz. 504, 514-15 ¶ 43, 975 P.2d 94, 104-05 (1999).

**¶85** (2) The State's failure to allege an element of the charged offense in the grand jury indictment—the aggravating factors that made Morris death eligible—is a fundamental defect that renders the indictment constitutionally defective because it violates the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article 2, Sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution. We rejected this argument in *McKaney v. Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 273 ¶ 23, 100 P.3d 18, 23 (2004).

**¶86** (3) The F.6 "especially heinous, cruel or depraved" aggravating factor is unconstitutionally vague and overbroad because the jury does not have enough experience or guidance to determine when the aggravator is met. The finding of this aggravator by a jury violates the Eighth and Fourteenth Amendments because it does not sufficiently place limits on the discretion of the sentencing body, the jury, which has no "narrowing constructions" to draw from and give "substance" to the otherwise facially vague law. We rejected this argument in *State v. Cromwell*, 211 Ariz. 181, 188-90 ¶¶ 38-45, 119 P.3d 448, 455-57 (2005), *cert. denied*, 126 S. Ct. 2291 (2006), and *Anderson II*, 210 Ariz. at 353 ¶ 114, 111 P.3d at 395.

¶87      (4) By allowing victim impact evidence at the penalty phase of the trial, the trial court violated Morris's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution.  We rejected challenges to the use of victim impact evidence in *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶¶ 16-17, 68 P.3d 412, 417 (2003).

¶88      (5) The trial court improperly omitted from the penalty phase jury instructions language to the effect that the jury may consider mercy or sympathy in deciding the value to assign the mitigation evidence, instead telling the jury to assign whatever value it deemed appropriate.  The court also instructed the jury that they "must not be influenced by mere sympathy or by prejudice in determining these facts."  These instructions limited the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, 15, 23, and 24 of the Arizona Constitution.  We rejected this argument in *State v. Carreon*, 210 Ariz. 54, 70-71 ¶¶ 81-87, 107 P.3d 900, 916-17, *cert. denied*, 126 S. Ct. 122 (2005).

¶89      (6) The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution.  This Court and the United States Supreme Court have rejected this

40

argument. *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Harrod*, 200 Ariz. 309, 320 ¶ 59, 26 P.3d 492, 503 (2001), *vacated on other grounds*, 536 U.S. 953 (2002) (mem.).

¶90        (7) The death penalty is irrational and arbitrarily imposed; it serves no purpose that is not adequately addressed by life in prison, in violation of the defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, Sections 1 and 4 of the Arizona Constitution.   We rejected these arguments in *State v. Smith*, 203 Ariz. 75, 82 ¶¶ 35-36, 50 P.3d 825, 832 (2002), and *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

¶91        (8) The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments, and Article 2, Sections 1, 4, and 15 of the Arizona Constitution.   We rejected this argument in *State v. Sansing*, 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954 (2002) (mem.).   *See also State v. Finch*, 202 Ariz. 410, 419 ¶ 50, 46 P.3d 421, 430 (2002).

¶92        (9) Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article 2, Sections 1, 4, and 13 of the Arizona Constitution.   We rejected this argument in *Sansing*, 200 Ariz.

at 361 ¶ 46, 26 P.3d at 1132. *See also State v. Stokley*, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995).

¶93    (10) Proportionality review serves to identify which cases are above the "norm" of first degree murder, thus narrowing the class of defendants who are eligible for the death penalty.    The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution.    We rejected this argument in *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995). *See also State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992).

¶94    (11) Arizona's capital sentencing scheme is unconstitutional because it does not require the State to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances.    Instead, Arizona's death penalty statute requires defendants to prove their lives should be spared, in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution.    We rejected this argument in *State v.*

*Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988). *See also Carreon*, 210 Ariz. at 76 ¶ 122, 107 P.3d at 922.

¶95      (12) Arizona's death penalty scheme does not sufficiently channel the sentencing jury's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. Arizona Revised Statutes section 13-703.01 is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. We rejected this argument in *State v. Pandeli*, 200 Ariz. 365, 382 ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds*, 536 U.S. 953 (2002) (mem.). *See also State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

¶96      (13) Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. We rejected this argument in *State v. Van Adams*, 194 Ariz. 408, 422 ¶ 55, 984 P.2d 16, 30 (1999), and *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

¶97    (14) Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. Arizona's death penalty law cannot constitutionally presume that death is the appropriate default sentence. We rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

**V.**

¶98    For the foregoing reasons, we affirm Morris's convictions and sentences.


_____
       Ruth V. McGregor, Chief Justice

CONCURRING:


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice


_____
W. Scott Bales, Justice