NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

OLAWALE OLAOYE, *Appellant.*

No. 1 CA-CR 19-0416
FILED 12-31-2020

---

Appeal from the Superior Court in Maricopa County
No. CR2018-001792-001
The Honorable Julie Ann Mata, Judge *Pro Tempore*

**VACATED AND REMANDED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jennifer L. Holder
*Counsel for Appellee*

Maricopa County Legal Advocate's Office, Phoenix
By Michelle DeWaelsche
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge David B. Gass delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Michael J. Brown joined.

---

**G A S S**, Judge:

¶1        Olawale Olaoye appeals his conviction for sexual assault. He argues the prosecutor engaged in multiple instances of misconduct that cumulatively deprived him of a fair trial. Because the prosecutor's misconduct was egregious and pervasive, we vacate Olaoye's conviction and remand for a new trial.

## FACTUAL AND PROCEDURAL HISTORY

¶2        S.H. and her friend, M.H., went out drinking. S.H. met Olaoye at the first bar they visited. They had a short conversation, and S.H. asked Olaoye for his phone number. S.H. and M.H. visited two or three more bars then returned to the first because S.H. believed she had left her debit card there. S.H. texted Olaoye upon returning to the first bar at approximately 10:30 p.m., saying she returned.

¶3        S.H. and M.H. stayed at the bar until it closed. During the night, they met D.S., who was interested in S.H. D.S. bought S.H. and M.H. each a "bucket" holding 32 ounces of an alcoholic beverage. Olaoye also bought S.H. a drink. By night's end, S.H. testified she believed she had consumed seven to eight alcoholic beverages and admitted to using marijuana. But when she talked to a nurse the night of the incident, S.H. said she had fewer drinks and did not say she had used marijuana.

¶4        Olaoye, S.H., M.H., and D.S. were all sitting at a table together for approximately thirty minutes before the bar closed. The four of them left the bar a little after 2:00 a.m. As S.H. stood to leave, she was unsteady on her feet and appeared disoriented. M.H. thought S.H. seemed okay at the time, but D.S. believed she was "more than a little intoxicated."

¶5        S.H., M.H., and D.S. planned to share a ride home. As they waited, S.H. and Olaoye were kissing and then walked away, with S.H. saying she would return. When their ride arrived, S.H. had not returned. M.H. and D.S. went looking for her, with M.H. calling out her name. As they walked around a nearby park, M.H. saw the soles of Olaoye's feet poking out from behind a concrete barrier. Suspecting Olaoye and S.H. were having sex and finding the situation awkward, M.H. and D.S. walked away.

¶6        M.H. and D.S. returned to the concrete barrier a short time later, with M.H. again calling out S.H.'s name. This time, M.H. and D.S. looked over the barrier and saw Olaoye having sex with S.H. while she appeared to be unconscious. S.H. was lying on her back, motionless and

silent, with her eyes closed, her head turned to the side, and her legs and arms flat on the ground. M.H. and D.S. began yelling at Olaoye to stop and to get off her. M.H. saw Olaoye "pump two more times" then get off S.H. Olaoye said, "I'm sorry. She was fine. She was awake."

¶7        S.H.'s blood-alcohol concentration was estimated to be between 0.163 and 0.253 an hour after the bar closed. She did not remember leaving the bar, walking off with Olaoye, or consenting to sex. The first thing S.H. remembered was regaining consciousness with Olaoye on top of her, his penis insider her, hearing M.H. calling her name, and feeling "scared." S.H. said she "kind of just blacked out after that."

¶8        The State charged Olaoye with one count of sexual assault. Jurors could not reach a verdict at Olaoye's first trial. The State retried Olaoye about six weeks later. Jurors at Olaoye's second trial convicted him of sexual assault and found, as an aggravating factor, Olaoye caused S.H. emotional harm. The superior court sentenced Olaoye to a presumptive term of seven years imprisonment with 541 days of presentence incarceration credit.

¶9        Olaoye timely appealed. This court has jurisdiction under Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 13-4031 and -4033.A.1.

**ANALYSIS**

**I.    The prosecutor committed pervasive misconduct.**

¶10        Olaoye contends the prosecutor committed multiple acts of misconduct during his trial. He argues those acts cumulatively constitute fundamental error and entitle him to a new trial.

¶11        Unless otherwise indicated, Olaoye did not object at trial to the alleged instances of misconduct. Accordingly, he must show fundamental error to establish his cumulative misconduct claim. Fundamental error analysis first requires Olaoye to establish error exists. *See State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018). He then must establish either "(1) the error went to the foundation of the case, (2) the error took from [Olaoye] a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial." *See id.* (emphasis original).

¶12        "Consistent with the third prong of *Escalante*," Olaoye does not need to demonstrate prejudice for each individual instance of

prosecutorial misconduct because "a successful [cumulative error] claim necessarily establishes the unfairness of a trial." *See State v. Vargas*, 249 Ariz. 186, 190, ¶ 13 (2020). Accordingly, under *Vargas*, Olaoye must: (1) assert cumulative error exists; (2) cite to the record where the alleged instances of misconduct occurred; (3) cite to legal authority establishing the alleged instances constitute prosecutorial misconduct; and (4) set forth the reasons why the cumulative misconduct denied him a fair trial with citation to applicable legal authority. *See id.* at ¶ 14. Recognizing Olaoye has met step one of *Vargas*, we turn to each of the alleged instances of misconduct and Olaoye's supporting legal authority.

### A. The prosecutor engaged in improper argument during the State's opening statement.

¶13        "Opening statement is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted." *State v. Bible*, 175 Ariz. 549, 602 (1993). The prosecutor, nonetheless, three times referred to evidence the defense would likely emphasize and then rhetorically asked jurors what that evidence had to do with whether S.H. consented—the main issue in this case. Olaoye objected to two of the prosecutor's three rhetorical questions. The superior court reasonably sustained both times. The prosecutor's repeated attempts manifested a disregard for proper opening statement presentation. *See id.*

### B. The prosecutor improperly asked a lay witness to opine on the ultimate issue.

¶14        The prosecutor asked D.S. the following:

Q: And let's be clear. If you have sex with someone while they're passed out, is that consensual?

A: No. I would think not.

Q: Okay. Would you do that?

A: No.

Q: If -- what is consensual sex to you?

A: Someone who allows -- you know, it's kind of something that just happens.

Q: Okay.

A: It's like a mutual thing. It's not really -- yeah. You know, I think. You know?

Q: You know or you should know?

A: You know or you should know. Right.

Q: Okay. Was what you saw a mutual thing?

A: My perspective, no.

Q: Is what you saw consensual sex?

A: No.

**¶15**    We ordered the parties to provide supplemental briefing on whether this questioning was improper. We hold it was.

**¶16**    Opinion testimony from a lay witness is limited to things "rationally based on the witness's perception [and] helpful to . . . determining a fact in issue." Ariz. R. Evid. 701. Additionally, testimony should still be excluded when "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ariz. R. Evid. 403. Though a lay witness's testimony may "embrace[] an ultimate issue," it must still comply with Rules 701 and 403. *See* Ariz. R. Evid. 704(a).

**¶17**    Because it was uncontested Olaoye and S.H. engaged in sexual acts, consent was the only issue for the jury. Asking D.S. for an opinion on the ultimate issue was tantamount to asking him "is Olaoye guilty?" *See Fuenning v. Superior Court*, 139 Ariz. 590, 605 (1983) ("[I]t would be neither necessary nor advisable to ask for a witness' opinion of whether the defendant committed the crime with which he was charged."). D.S. could testify to S.H.'s condition, how she appeared, what Olaoye said, and other facts he observed. But asking D.S. if S.H. consented required D.S. to delve into S.H.'s mental state and went far beyond D.S.'s personal knowledge. And D.S.'s answers—on their face—were highly prejudicial and sought to relieve the State of its burden. *See Escalante*, 245 Ariz. at 141, ¶ 18.

**¶18**    We note the superior court also elicited a separate lay witness's opinion on the ultimate issue. The superior court asked the following jury question to the lead detective:

In opening arguments, the jury was told that penile penetration of [S.H.'s] vagina did occur. The question is: Did

[S.H.] consent? Detective, please explain why you believe the sex was an assault rather than consensual.

**¶19** The superior court's question from the juror was improper. It contravened Rule 701, by asking a lay witness to speculate on a subject of which he has no personal knowledge, and Rule 403, by provoking unfair prejudice outweighing any discernable probative value. Though we do not consider the court's question in our analysis of cumulative prosecutorial misconduct, we address it to ensure a similar error does not occur on remand. *See State v. Sanchez-Equihua*, 235 Ariz. 54, 59, ¶ 17 (App. 2014).

### C. The prosecutor engaged in vouching.

**¶20** The prosecutor vouched for the State's case when he asked the lead detective whether every investigation by law enforcement is submitted for prosecution and whether every submission results in criminal charges.

**¶21** "Prosecutorial vouching takes two forms: (1) where the prosecutor places the prestige of the government behind its evidence and (2) where the prosecutor suggests that information not presented to the jury supports the evidence." *State v. Newell*, 212 Ariz. 389, 402, ¶ 62 (2006) (quotation and alternations omitted). Bolstering the credibility of a State's witness during closing argument constitutes vouching unless the trial evidence supports the prosecutor's characterization of the witness as truthful and the prosecutor emphasizes that jurors are to decide whether witnesses are credible. *State v. Corona*, 188 Ariz. 85, 91 (App. 1997).

**¶22** The only relevance for this line of questioning is to suggest the charges against Olaoye show the case against him was strong. This inference is at odds with the requirement jurors "must not think that the Defendant is guilty just because of a charge." Rev. Ariz. Jury Instr. Stand. Crim. 2 (4th ed.).

### D. The prosecutor impugned the integrity of defense counsel.

**¶23** During his rebuttal closing, the prosecutor said: "Defense counsel did this throughout the trial and in closing, attacking the victim of this case, [S.H.]. Attacking the victim of a sex assault. I'm not even going to touch that."

**¶24** "While commentary about the defense's theory is common, an argument that impugns the integrity or honesty of opposing counsel is

improper." *State v. Hulsey*, 243 Ariz. 367, 390, ¶ 99 (2018) (quotation and alterations omitted).

**¶25** The statements do not relate to the defense's theory but seem designed to appeal to juror sympathy. The record reveals no indication defense counsel engaged in anything other than a respectful—and constitutionally protected—examination and argument. Testing an accuser's account and credibility is part of defense counsel's duty and is not an "attack" on S.H.

### E. The prosecutor improperly appealed to juror sympathy.

**¶26** After showing video of S.H. tearfully talking to an officer about the incident, the prosecutor stated: "Imagine being in [S.H.'s] position. 'I didn't want to get hurt.' 'I didn't want him to hurt me.' Waking up and having no idea what's going on and then realizing that's what's happening to you."

**¶27** Though lawyers are given "wide latitude" in their closing arguments, "including commenting on the vicious and inhuman nature of the defendant's acts," it was improper for the prosecutor to ask jurors to imagine themselves in S.H.'s place. *See State v. Morris*, 215 Ariz. 324, 337, ¶ 58 (2007) (quotation omitted). In this instance, the prosecutor was not simply asking jurors to rely on their own common sense and experience. He was "playing on their sympathy for [S.H.]." *See id*.

### F. The prosecutor referred to evidence outside the record.

**¶28** Olaoye argues the prosecutor's use of a baggie of rosemary during closing argument and related comments were improper. We agree.

**¶29** In making closing arguments, lawyers may draw reasonable inferences from the evidence but "may not refer to evidence which is not in the record or 'testify' regarding matters not in evidence." *State v. Acuna Valenzuela*, 245 Ariz. 197, 216–17, ¶ 71 (2018) (quotation omitted).

**¶30** When D.S. and M.H. saw Olaoye having sex with S.H., Olaoye was on top of her. Some trial evidence, however, arguably supported an inference Olaoye was not on top of S.H. during the entire incident. S.H. had small abrasions on her shins and ankles, and Olaoye had some sort of plant matter on the back of his head. When the prosecutor questioned the detective who photographed Olaoye after the incident, the prosecutor described the debris on Olaoye's head as "possibly grass." When asked, the detective said he did not know where the substance came from. On cross-

examination, the detective said he saw "a few blades of grass" on the back of Olaoye's head.

¶31        During closing argument, the prosecutor showed the jury a baggie of rosemary and argued the photos of Olaoye's head did not show grass but rather rosemary from a bush Olaoye must have brushed against as he lay on top of S.H. In short, the prosecutor took on the role of witness to lay foundation for his manufactured, demonstrative exhibit. The prosecutor went on to use his demonstrative exhibit to establish substantive evidence—telling the jury the photo showed Olaoye had rosemary, not grass, on the back of his head. No trial witness even mentioned rosemary. The prosecutor also told the jury the photographs showed rosemary bushes in the area. He then went on to argue this new evidence showed Olaoye was never positioned underneath S.H. In the State's rebuttal closing, the prosecutor further built on this error, arguing the presence of rosemary on Olaoye's head "disprove[d] that that man was lying on the ground" and as a result "disprove[d] [Olaoye's] defense."

¶32        The State concedes the prosecutor referred to evidence not in the record—that there were rosemary bushes in the area. Police photographs did show bushes in the area where the incident took place. But there was no evidence any of those bushes were rosemary or evidence showing exactly where Olaoye's head would have been relative to any vegetation. Moreover, the prosecutor's display of an extrinsic baggie of rosemary was far more egregious than a mere lapse of memory where counsel forgets what had been admitted into evidence. Here, the prosecutor deliberately brought unadmitted evidence to trial and pulled it from his pocket in a dramatic, calculated fashion to show the jury during his closing.

¶33        In short, the prosecutor's actions and statements rose to the level of unsworn testimony meant to conclusively rebut an important factual consideration in Olaoye's defense. *See Escalante*, 245 Ariz. at 141, ¶ 18. The prosecutor's actions were deliberate, highly prejudicial, and inappropriate.

II.    **Olaoye's other cited instances do not rise to the level of prosecutorial misconduct.**

    A.    **The prosecutor inartfully stated the law but did not misstate it.**

¶34        In the prosecutor's rebuttal closing, he told the jurors defense counsel's statements about Olaoye receiving the benefit of the doubt were "not entirely true" and Olaoye "doesn't get the benefit of the doubt

automatically." Olaoye objected twice, claiming the prosecutor misstated the law. The superior court sustained both objections. The prosecutor ultimately read the instructions again to the jury and said "[s]o we're talking firmly convinced or real possibility." Olaoye again objected, but the superior court overruled that objection.

**¶35**        "[P]rosecutors may argue their version of the evidence to the jury, [but] they may not misstate the law." *State v. Murray*, 247 Ariz. 583, 593, ¶ 28 (App. 2019). Here, we find no misstatement.

**¶36**        The prosecutor's initial wording was inartful, but not misconduct. He attempted to fairly characterize the burden of proof. And, when taken together with the final jury instructions, he ultimately gave a correct characterization. *Cf. State v. Patterson*, 230 Ariz. 270, 276, ¶ 25 (App. 2012) (mistrial not required when prosecutor corrected a misstatement of the law and the superior court correctly instructed jurors).

**¶37**        Olaoye also contends the prosecutor misstated the law when he used the phrase "blacked out" to describe the concept of consent. In rebuttal closing, the prosecutor reminded jurors S.H. and Olaoye undisputedly had sex—the only issue in the case was consent. He rhetorically asked if S.H. was unable to consent because she was intoxicated or "Passed out. Blacked out. Whatever." Olaoye objected, saying the prosecutor misstated the law, but the superior court overruled his objection.

**¶38**        The prosecutor did not misstate the law. The prosecutor's remarks do not show him including "blacked out" as part of the definition of "without consent." Instead, the comments indicate he was asking jurors to apply the law regarding capacity to consent while intoxicated to a reasonable inference from the evidence—that S.H. was unconscious. *See State v. Goudeau*, 239 Ariz. 421, 467, ¶¶ 203–04 (2016) (prosecutor did not misstate the law by asking jurors to consider facts permitted by the applicable legal standard).

### B.        The prosecutor did not facilitate perjury by failing to correct a witness's testimony on tangential issues.

**¶39**        Olaoye claims the prosecutor failed to alert the superior court to false testimony by the lead detective. Olaoye's argument relates to a 39-minute telephonic interview with defense counsel and the nurse who examined S.H. after the incident. The prosecutor listened to the interview from his office, with the lead detective eventually joining. When asked at trial about his presence during the interview, the lead detective said he "popped in for a short amount of time." Upon further questioning, the

detective said he did not remember exactly how long he stayed, but it was not long. Olaoye disputes this testimony, arguing the detective was present for most of the interview. He argues the detective perjured himself and the prosecutor, therefore, should have corrected the testimony.

**¶40**   A witness commits perjury by testifying regarding a material issue believing the testimony is false. A.R.S. § 13-2702.A.1. Knowingly using false testimony to convict a defendant constitutes a denial of due process and is reversible error without a showing of prejudice. *State v. Ferrari*, 112 Ariz. 324, 334 (1975).

**¶41**   The detective did not commit perjury in this case. The length of time he was present during the nurse's interview was not a material issue and the detective could have reasonably believed he missed a substantial portion of it. The detective's presence during the interview was tangential to the State's case and only marginally relevant to his credibility. The prosecutor had no duty, therefore, to alert the superior court.

### C.  The prosecutor's use of charged language was not improper argument.

**¶42**   During questioning, the prosecutor referred to Olaoye "having nonconsensual sex" with S.H., talked about Olaoye "having sex with [S.H.] while she was passed out," and described the incident as a "sexual assault."

**¶43**   We find no misconduct in the prosecutor's use of these charged terms or including them in relevant questioning of State witnesses. The prosecutor's references to Olaoye having sex with S.H. while she was "passed out" were permissible because the prosecutor was merely repeating D.S.'s testimony—that he saw Olaoye "[h]aving sex with" S.H. while she was "passed out." Similarly, the prosecutor's use of "assault" and "sexual assault" in his questions to S.H. were permissible because they were supported by S.H.'s testimony that the sex with Olaoye was unwelcome. Olaoye concedes the mere use of phrases like "sexual assault" or "while she was passed out" do not constitute misconduct. Instead, without citation to any authority, he argues their repetitive use tainted the trial. The argument is not persuasive. *See* Ariz. R. Crim. P. 31.10 (appellants must support their arguments "with citations of legal authorities").

**D.      The prosecutor's comment about defense counsel's argument did not otherwise impugn him.**

**¶44**          Olaoye argues the prosecutor engaged in misconduct when he said defense counsel had "a way of spinning words and fitting them in definitions," later adding, "[w]ords can be twisted." Olaoye objected, but the superior court overruled the objection.

**¶45**          The prosecutor's statements about defense counsel "spinning" or "twisting" words were permissible. During closing argument, defense counsel argued jurors should remember S.H. consented to acts leading up to the sex—such as the amount she drank and her flirtatious behavior with Olaoye—when determining if she could consent to sex. The prosecutor's statements go to Olaoye's consent defense, not a personal attack on defense counsel. *See Hulsey*, 243 Ariz. at 390, ¶ 99.

**E.      The prosecutor drew proper inferences from the record and commented on witness bias but did not otherwise vouch for evidence or appeal to juror sympathy.**

**¶46**          Olaoye contends the prosecutor improperly vouched for the State's case during closing argument when he (1) described the victim as being "up front and honest with [the jurors]" when she blamed herself for drinking too much on the night of the assault and (2) described D.S. as not "hav[ing] a dog in this fight," making him an "independent, unbiased witness." The superior court, however, sustained Olaoye's vouching objection when the prosecutor made a similar statement about D.S. not "hav[ing] a horse in the race" during the prosecutor's examination of the lead detective.

**¶47**          "Prosecutors have wide latitude in presenting their arguments to the jury," and may argue all reasonable inferences from the evidence. *Morris*, 215 Ariz. at 336, ¶ 51 (quotations omitted). Contrary to Olaoye's arguments, the prosecutor's statements were based on trial evidence and, therefore, were not vouching. For example, during trial S.H. admitted to drinking the equivalent of seven to eight alcoholic beverages and smoking marijuana on the night of the incident. But when talking to the nurse who examined her shortly after the incident, S.H. said she drank much less alcohol and took no drugs. Additionally, though D.S. admitted he was interested in S.H., other evidence supported the inference he had no reason to lie about what he observed Olaoye doing to S.H. Further, though the prosecutor did not expressly emphasize to jurors they were the sole arbiters of witness credibility, he suggested as much when he directly asked

the jury to consider if S.H., D.S., and M.H. were credible. Accordingly, regarding these instances, the prosecutor did not engage in either form of vouching as discussed above. *See Newell*, 212 Ariz. at 402, ¶ 62; *Corona*, 188 Ariz. at 91.

**¶48**        Olaoye also argues the prosecutor impermissibly appealed to juror sympathy in his initial closing statement. The prosecutor said the incident "affected" the friendship between S.H. and M.H. because, when the two of them met Olaoye that night, M.H. did not "think [Olaoye] was a bad guy" and "trusted" him with S.H. The statement was a comment about M.H.'s truthfulness and bias. It was a statement on the evidence and not an "appeal to the fears or passions of the jury." *See Morris*, 215 Ariz. at 337, ¶ 58.

### III.    The cumulative effect of the prosecutor's misconduct deprived Olaoye of a fair trial.

**¶49**        This court considers claims of prosecutorial misconduct "in the context of the issues presented to the jury at trial." *State v. Arias*, 248 Ariz. 546, 556, ¶ 33 (App. 2020). As discussed above, one issue predominated at trial—consent. Specifically, the jury had to determine whether Olaoye's acts were without S.H.'s consent, whether she was incapable of consenting to sex because of her intoxication, and whether Olaoye knew he was acting without her consent.

**¶50**        We identify six instances of misconduct: (1) improper argument during opening statement; (2) asking a lay witness to decide Olaoye's guilt; (3) vouching for the State's case during the lead detective's testimony; (4) impugning defense counsel; (5) appealing to juror sympathy; and (6) presenting evidence not introduced at trial. Having met the first three *Vargas* steps, we now evaluate if Olaoye has met his burden under step four—establishing the errors collectively deprived him of a fair trial. *See* 249 Ariz. at 190, ¶ 14. We conclude Olaoye has met his burden.

**¶51**        "To warrant reversal, the prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *Newell*, 212 Ariz. at 402, ¶ 61 (quotation omitted). Here, the prosecutor's misconduct began with his opening statement, continued into his examination of witnesses, and culminated in a closing argument during which he displayed extrinsic, demonstrative evidence to the jury while arguing facts not in evidence.

**¶52**        Two of the instances of prosecutorial misconduct stand out as particularly egregious for their intentionality and prejudicial effects. First,

the prosecutor effectively asked D.S. to tell the jury whether he thought Olaoye was guilty. The prosecutor elicited lay testimony going directly to the ultimate issue—an issue D.S. could not possibly have any personal knowledge of as he witnessed the incident. Second, by attempting a dramatic moment in which he pulled a baggie of unadmitted rosemary from his pocket to dispose of Olaoye's defense, the prosecutor "intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice [Olaoye]." *See State v. Lynch*, 238 Ariz. 84, 92, ¶ 6 (2015), *rev'd on other grounds*, *Lynch v. Arizona*, 136 S. Ct. 1818 (2019). Both prosecutorial missteps go to "the foundation of the case" by "reliev[ing] the prosecution of its burden to prove a crime's elements" and "directly impact[ing] a key factual dispute." *See Escalante*, 245 Ariz. at 141, ¶ 18.

**¶53** Considering the occurrences of impropriety "in the context of the entire proceeding," Olaoye has shown misconduct "so infected [his] trial with unfairness as to make the resulting conviction a denial of due process." *See Morris*, 215 Ariz. at 335, ¶ 46 (quotation omitted). The prosecutor's misconduct was pervasive, intentional, and prejudicial. Cumulatively, these errors so "profoundly distort[ed] the trial that injustice is obvious." *See Escalante*, 245 Ariz. at 141, ¶ 20.

**¶54** Though we cannot say any individual instance discussed above is so fundamental to warrant reversing for a new trial, that is not our standard. *See Vargas*, 249 Ariz. at 190–91, ¶ 17. Instead, Olaoye must show the prosecutor intentionally tainted this trial in the aggregate and obscured the issues for the jury. *See id.* at 190, ¶ 14. He has done so.

## CONCLUSION

**¶55** We vacate Olaoye's conviction and remand the case to the superior court for retrial.

